IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| THE SATANIC TEMPLE, INC. | CASE NO. 19-CV-01122 (WMW/LIB) |
| PLAINTIFF, | |
| V. | [proposed] |
| CITY OF BELLE PLAINE, MN | AMENDED COMPLAINT |
| DEFENDANT. | |

COMES NOW Plaintiffs, The Satanic Temple, Inc. ("**TST**"), by and through counsel Matthew A. Kezhaya (Ark. Bar # 2014161, proceeding *pro hac vice*) of Kezhaya Law PLC and local counsel Jason S. Juran (#0397935) and Robert R. Hopper (#208760), both of Robert R. Hopper & Associates LLC, with an amended complaint pursuant to FRCP 15.

## EXPLANATORY NOTE

1. This amended complaint is intended to correct the pleading deficiencies identified in the Court's order of dismissal (without prejudice) of the constitutional issues.  Doc. 46.  The core factual allegations are still the same: essentially taking issue with the fact that the City opened a limited public forum to allow a Christian monument but closed it to exclude a Satanic one.

2.  A member of TST is newly identified.  Jane Doe is a TST member who personally interacted with the Christian monument in the Veterans Park, which vests TST with standing to sue over the Establishment Clause violation from the City's decision to create a limited public forum for the explicit purpose of accommodating a Christian monument.  E.g. <u>ACLU Neb. Found. V. City of Plattsmouth</u>, 358 F.3d 1020 (8th. Cir. 2004) ("Plattsmouth I"), overturned on other grounds, 419 F.3d 772.

3.  For the reasons stated in the order of dismissal (Doc. 46), promissory estoppel is preserved.

4.  This amendment reasserts Free Exercise, Free Speech, and Equal Protection Clause violations.

5.  This amendment adds counts for the Establishment Clause and the Due Process Clause.

6.  The Minnesota analogs are excluded because they are coextensive with the above claims.

7.  This amendment does not re-assert the RLIUPA claim, the breach of contract claim, or the claims against the individual councilmembers.

8.  More particularly, this amendment differs from the original complaint because

it:

(1) Details the Satanic nature of TST's monument and the religious motivation in TST's involvement in this matter, such that Resolution 17-090 impacts the Free Exercise Clause;

(2) Identifies the fact and timing of publicly available statements which show the City's highest-elected officials had a conscious purpose of promoting Christianity by enacting Resolution 17-020 and had a conscious purpose of discouraging Satanism by enacting Resolution 17-090, such that Resolution 17-020 impacts the Establishment Clause and such that Resolution 17-090 impacts the Free Speech, Free Exercise, and Equal Protection Clauses;

(3) Identifies the fact and timing of some off-the-record discussions and deliberations from the City's highest-elected officials, as intimated by publicly available statements;

(4) Details the adverse public reaction to the City's permission for TST to place a Satanic monument, such that Resolution 17-090 impacts the Free Speech, Free Exercise, and Equal Protection Clauses;

(5) Identifies how TST and the Belle Plaine Veteran's Club are similarly

situated, such that Resolutions 17-020 and 17-090 impact the Equal Protection Clause;

(6) Identifies the factual basis for determining monetary damages;

(7) Clarifies the party-plaintiffs by identifying the correct the legal entity and adding the individual Satanist who begat the Veteran's Park controversy; and

(8) Otherwise generally elucidates on the factual details giving rise to this litigation.

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction over this case under 28 USC § 1331 (federal question) because TST complains of alleged constitutional violations under color of state law which are actionable under 42 USC § 1983 (authorizing a cause of action for such claims) and 28 USC § 2201 (authorizing declaratory judgments), which are both federal laws.

10. The Court further has diversity jurisdiction under 28 USC § 1332 because the sum of TST's damages, both pecuniary and consequential, is expected to exceed $75,000.

11. The Court further has supplemental jurisdiction over the promissory estoppel

claim under 28 USC § 1367.  This state law claim is so related to the federal claims that they form part of the same case or controversy.

12. This Court has personal jurisdiction over City because it is within this Court's District.

13. Venue properly lies with this Court under 28 USC § 1391(b) because the conduct complained of happened in this Court's District.

## PARTIES

14. **The Satanic Temple, Inc.**, plaintiff, (abbreviated to "**TST**") is an IRS-recognized atheistic religious corporation with its principal place of business in Massachusetts.  TST's membership exceeds 200,000 and was recently the subject of the film, "Hail Satan?" (2019, Magnolia Films).  See also <u>Satanic Temple v. City of Scottsdale</u>, No. CV18-00621-PHX-DGC, 2020 WL 587882 (D. Ariz. Feb. 6, 2020) (holding that TST is a bona fide religion).  TST's membership can be found in every state, importantly to include Minnesota.  TST venerates (but does not worship) the biblical adversary as a promethean icon against tyranny.  For TST and its membership, the Satan described in Paradise Lost and like works is a revolutionary antihero who stood up against impossible odds to seek justice and egalitarianism for himself and others.  TST propagates its Seven Tenets:

1. One should strive to act with compassion and empathy toward all creatures in accordance with reason.

2. The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

3. One's body is inviolable, subject to one's own will alone.

4. The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.

5. Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs.

6. People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.

7. Every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

https://thesatanictemple.com/pages/about-us (last visited November 11, 2020). Far from the Seven Tenets being the sole "core" of TST's religious beliefs and practices, other core features of TST includes (among many other things)

the use of religious iconography derived from occultic works. Of importance to this case, the inverted pentagram is one such symbol. In 2017, TST commissioned the construction of a monument which featured an inverted pentagram in reliance of the City's grant of a permit to place that monument in its Veterans Park alongside a preexisting Christian monument; but, before TST could install its monument, the City revoked the permit and precluded all future private monuments. In effect, the revocation only impacted TST.

15. **The City of Belle Plaine, MN**, defendant, is a municipal corporation located in Scott County, Minnesota. The City is governed by a five-member city council elected at-large. At the relevant time, the City Council consisted of Mayor Christopher G. Meyer, and Councilpersons Ben Stier, Cary Coop, Paul Chard, and Theresa McDaniel. The meetings of the Council were televised and, going back to December 21, 2009, are publicly available at https://www.belleplainemn.com/city-council-meeting (last visited November 12, 2020). In 2017, the City enacted a resolution to open its Veterans Park to private monuments to promote Christianity and then rescinded the resolution to discourage Satanism.

### FACTS ALLEGED

## Background

16. The City established the Veterans Park in 2001 "to honor those who served our country in war as in peace" (i.e. veterans, generally, not just Belle Plaine veterans) https://www.belleplainemn.com/park/veterans-park (last visited November 12, 2020).

17. Until August of 2016, the Veterans Park was a purely secular affair. The only monument–other than some signs and flags–was a retired helicopter. Id.

## Installation of the Christian monument

18. In August of 2016, a resident entered the Veterans Park without authority from the City and installed a metal monument together with a concrete base. The monument depicted a silhouette of a solider kneeling to a Latin Cross, which is a well-known symbol of religious significance to Christians. The monument is 3' wide x 2' deep x 3' tall. The materials, base, and measurement will all be important later.

19. The proponents of this monument would later come to identify it as "Joe," apparently named after its creator, Joseph Gregory, a Veteran who is now deceased. http://www.citypages.com/news/the-devil-went-down-to-belle-plaine-looking-for-35000/455788893 (last visited November 12, 2020).

20. At no point before the installation of the Christian monument had the City ever permitted any other religious iconography in the Veterans Park.

21. The City was made aware that the Christian monument had been installed but intially took no action.

22. The Star Tribune, a newspaper of general publication in Minnesota, depicted the Christian monument as follows:



Katy Read, *Star Tribune*, "Satanic Temple sues Belle Plaine over withdrawn permission for monument" (available at https://www.startribune.com/satanic-temple-sues-belle-plaine-over-withdrawn-permission-for-monument/509164882/) (last visited on November 12, 2020).

### First removal of the Christian monument

23. In late-August of 2016, a City resident identified herein as Jane Doe called the police department to complain about the legality of the Christian monument.

24. Ms. Doe was locally infamous as a vocal opponent of government-sponsored Christian messaging, having objected to a nativity scene on public grounds around Christmas of 2015.

25. At some point between late-August and October of 2016, the City Administrator opined to Ms. Doe that the Christian monument was constitutionally permissible.

26. In October of 2016, Ms. Doe sought a second opinion from the Freedom From Religion Foundation ("**FFRF**"), a nonprofit organization which advocates for atheists, agnostics, and other non-theists.  See generally https://ffrf.org/about (last visited on November 12, 2020).

27. Around October of 2016, the FFRF respectfully disagreed with the City Administrator and informed the City that it should remove the Christian monument, or the FFRF would have to bring the Establishment Clause issue to this Court's attention.

28. In January of 2017, the City reluctantly agreed that the above was an

Establishment Clause concern and issued public notice that the Cross would be removed from the Christian monument (i.e. the memorial could remain, but the Cross had to go).

29. The removal of the Cross caused something of a stir within the City's constituency, sparking vocal protests at the Veterans Park.

30. Ms. Doe began to suffer harassment and persecution at the hands of proponents of the Christian monument because they believed she was the one who was ultimately behind the City's decision to remove the Cross from the Veterans Park.

31. The harassment included threats of physical violence against Ms. Doe and included posting of her personal information ("doxxing," a common form of online harassment).

32. Because of the threats to her safety, Ms. Doe avoided attracting attention to herself and stopped shopping in town.

33. Ms. Doe also made contemporaneous complaints to the police and Councilmember Stier (who was in the line of succession to become the chief of police), but that did not resolve the issue.

34. Ms. Doe became a member of TST in March or early-April of 2017.

35. As a member of TST, Ms. Doe saw the Christian monument approximately twice daily because it was on her way to (and from) work.

36. At all times, the Christian monument offended Ms. Doe because it made her feel like a second class citizen in her own town.

37. In June of 2017, during the height of the public outcry detailed below, Ms. Doe relocated out of the City because she could no longer bear the harassment and persecution.

## Opening of the limited public forum for the purpose of reinstalling The Christian monument

38. At some point before February 6, 2017, the proponents of the Christian monument (the "**Veteran's Group**") coordinated with the Alliance Defending Freedom ("**ADF**"), a nonprofit organization which advocates for Christians.  See generally https://www.adflegal.org/about-us (last visited November 12, 2020).

39. The two groups strategized a workaround to the FFRF's Establishment Clause concern: declare a portion of the Veterans Park a "limited public forum" and permit the donation of privately-owned monuments.

40. The two groups expected their proposal would result in the FFRF and TST demanding equal access to memorials conveying a competing religious message.

41. They did not like the idea of the Christian monument sharing the Veterans Park

with others.

42. To permit a Christian monument but exclude a competing one, the pair of groups crafted their proposal to include criteria which would, in practice, limit the permissible monuments in the Veterans Park to only the Christian monument.  More particularly:

   (1) A donor must be a City resident or be an organization whose membership was comprised of at least 50% City residents (the Veteran's Group meets this description);

   (2) The proposed display must not exceed 3' wide x 2' deep x 3' tall (the dimensions of the Christian monument);

   (3) The proposed display must be made of stone, concrete, metal, or some combination thereof (the materials of the Christian monument);

   (4) As explained by Andy Parrish of the Veteran's Group during the Adopting Meeting, detailed below, the proposed display must be of a design "consistently seen in other parks" (the Christian monument would presumably fit this vague description);

   (5) The proposed display must specify the individual Belle Plaine Veteran being memorialized (the Christian monument meets this description); and

(6) There would be a maximum of five permitted displays in an area that can

accommodate up to 18.  See **EXHIBIT 1** (the proposal).

43. Thus, if the private monuments in the Veterans Park "happened" to include only

one religious viewpoint, then that was just a reflection of the "qualified" donors'

intent and the City had plausible deniability.

44. On January 3, 2017, the City Council had an off-the-record meeting about the

Veteran's Group's proposal.  **EXHIBIT 2**.

45. The City refused to produce the required recording of the off-the-record

meeting.

46. On January 16, Mike Votca (City Administrator at the time) met with the

Veteran's Group about the above proposal.

47. The City refused to produce documents in discovery about the January 16

meeting.

## The Adopting Meeting

48. On February 6 (the "**Adopting Meeting**,") a City Council meeting was held to

hear out this plan.  The recorded meeting–and all other meetings referenced

herein–can be downloaded at https://www.belleplainemn.com/city-council-

meeting (last visited November 12, 2020) (a warning: the source volume is 20x a

reasonable level).

49. The Adopting Meeting was well-attended, leaving standing room only.

50. This level of attendance starkly contrasted the sparse attendance of the noncontroversial, prior, meetings. E.g. December 12, 2016 meeting and January 17, 2017 meeting.

51. The audience participation at the Adopting Meeting was less reflective of a meeting about city governance than a game show, with the audience cheering or jeering depending on its approval or disapproval with what was said. Id. at, e.g., 46:25-46:42 (cheering) and 57:50-58:10 (jeering).

52. The Adopting Meeting opened with publicly-recorded advice from the City Attorney, Mr. Robert "Bob" Vose, about the constitutional significance of converting a portion of the Veterans Park from a public park (where the City is the speaker) to a limited public forum (where the City is moderating the speech of private parties). Id. at 9:00 – 13:58.

53. Mr. Vose then expressed a concern that this would put the City in a legally compromising position of who gets to participate in this limited public forum. Id. at 13:58 – 17:03.

54. During the Adopting Meeting, Andy Parrish proposed the adoption of the

limited public forum as described above for the express and contemplated purpose of returning the Christian monument to the Veterans Park, and requested audience assistance in making the request.  See Adopting Meeting 24:50 – 25:04.

55. The audience gleefully expressed approval for the proposal.  Id. at 25:05 – 25:08.

56. Mr. Parrish was clear that a key feature of this proposal was to limit permissible donors to only Belle Plaine residents or organizations whose membership was comprised of at least 50% Belle Plaine residents.  See id. at 34:38-35:08.  This qualification was specifically contemplated to preclude competing monuments from a different religious viewpoint.

57. In response to the proponents' plan, the City Attorney reiterated the concern that adopting this plan would put the City in a compromising position of having to decide who gets to participate in this public forum; and expressed concern that limiting it as proposed would be unconstitutional.  Id. at 37:25-39:22.

58. Mayor Meyer shared a financial concern with granting the proposal: the City's insurer counseled against it because of the obvious litigation that it was inviting.  Id. at 39:22 – 40:02 ("They're not into this kind of a fight.")

59. Mr. Vose agreed that the League (the City's insurer) would always be deferential

to his legal opinion, but that they shared his concerns about the proposal.  Id. at 40:02 – 40:40.

60. Councilmember Stier shared that the FFRF had informed the City that, if the proposal was adopted by the City Council, the FFRF intended to install an atheistic monument.  Id. at 40:40 – 41:16.

61. Councilmember Stier did not like the idea of the Christian monument having to compete with another religious viewpoint and asked the ADF's representative, "How can the City prevent monuments from the Freedom From Religion going into the Park?"  Id. at 41:16 – 41:36.

62. Even the ADF's representative acknowledged that this was untenable.

63. Councilmember Chard expressed his opinion that this proposal was a bad idea, financially, and could cost the City substantial sums.  Id. at 43:46 – 45:52.

64. The crowd did not share Councilmember Chard's concern, but Councilmember Chard emphasized that he served the whole city, not just the attendees.

65. Councilmember Stier expressed concern about a Satanic monument being permitted in the Veterans Park if the City opened the door to a Christian monument:

> I've seen monuments that are going up in Detroit right now
> that have [a] Satanic meaning to them.  So, how can we up

here, be assured that, number one, these monuments won't
go into that Park?

Id. at 49:36-50:00.

66. Andy Parrish assured Councilmember Stier that the policy was crafted

specifically to preclude a competing monument from a Satanic or atheistic group:

> There is [sic] specific criteria . . . [that] the monument would
> be consistently seen in other memorial parks.  A Satanic
> statute is not consistently seen in other memorial parks.
> Your foxhole, for an atheist foxhole thing, is not consistently
> seen in other memorial parks.

Id. at 50:00 – 50:40.

67. The City Attorney correctly emphasized why this is flagrantly unconstitutional:

> [T]his is illustrating my concern . . . The concern is that if the
> intent is, or the effect of the criteria is, to eliminate certain
> messages, that is constitutionally suspect–which is putting it
> nicely.  That is exactly what is *not* allowed: [which] is for the
> government to establish rules which prevent certain religions
> from speaking.

Id. at 51:35-52:11.

68. Councilmember Chard repeated his concern about the financial repercussions of

opening the limited public forum, i.e. the inevitable litigation expenses resulting

from the catch-22 of either violating the Constitution by yielding to the crowd's

demand for Christian exclusivity; or complying with the Constitution but

suffering the crowd's wrath.  Id. at 56:46-57:41.

69. In response to Councilmember Chard's hesitation, Andy Parrish threatened litigation unless the City granted the proposal. Id. at 57:41 - 58:17.

70. Councilmember Stier probed the audience's willingness for a compromise: have a secular memorial instead of a Christian one. This was inadequate for the audience's approval. Id. at 59:05 - 1:02:25.

71. The crowd was clear: the Veterans Park was to be opened for the express and contemplated purpose of permitting a Christian monument and only a Christian monument.

72. At the conclusion of the meeting, the Council narrowly passed a resolution to pursue the adoption of the Veteran's Group's limited public forum proposal, subject to the City Attorney's review and modification (the vote was 3-2). Id. at 1:03:40 - 1:07:10.

<u>Modifying the proposal</u>

73. After the Adopting Meeting, the City Attorney and the City Administrator set out to modify the proposal in a manner that would stand the best chance against a constitutional challenge.

74. On February 9, 2017, the City Administrator added that the City could unilaterally terminate the Veterans Park. **EXHIBIT 3**.

75. Notwithstanding the milquetoast text of the email, the City added the unilateral right to terminate as a kill switch to shut down the Veterans Park if and when an "undesirable" monument is requested.

76. At the time, the City was expecting two "undesirable" monuments: one from the FFRF and one from TST. **EXHIBIT 4**.

77. Had the City expected only a Christian monument, there never would have been a kill switch.

78. The City Administrator also modified the policy to place a one-year limit on displays, despite that the forum was designed to accommodate permanent fixtures to the land. **EXHIBIT 5**.

79. Mayor Meyer put it best: "This does not make sense to me that a person would go through all of these requirements to have to remove the display in one year." **Id.**

80. The Mayor's confusion is apt. The one-year limit was another feature specifically included to limit the City's exposure to "undesirable" monuments.

81. The City Administrator contemplated modifying the requirements so that the anticipated displays would not actually be permanent. **Id.** But this never made it into the final version. See Enacting Resolution, below. Thus, the City opened

the Park to monuments which had to be made of permanent materials, but would only be displayed temporarily.  This tension can only be explained as an effort to limit access to the Park from "undesirable" groups.

82. The City also gave the Veteran's Group and the ADF unique access to assist in the modifications of the proposal.

83. The City did not give the same benefit to the FFRF, TST, or any other "undesirable" groups.

84. On February 20, 2017, the ADF added a requirement for a $1,000,000 insurance policy.

85. They added this because the Veteran's Group already had a $1,000,000 insurance policy.

86. This modification was added for the contemplated purpose of permitting a Christian monument while unreasonably raising the financial burden to place a competing monument.

87. There is no reasonable rationale that a display contemplated by this policy (i.e. a temporary display, no bigger than 2' x 3') would ever, by itself, require $1,000,000 in insurance.

88. On February 20, 2017, the City permitted its personnel to engage in secretive

communications with Andy Parrish.  Mr. Parrish helpfully announced as much:



89. Following that phone conversation, Mayor Meyer requested the City Administrator to correct "the sticking points for the Veterans and also the Defend Group."  **EXHIBIT 6**.

90. The "sticking points" included that the Veteran's Group and the ADF demanded the policy to permit only donations from residents of the City.

91. By pushing for this, Mayor Meyer removed any doubt that he embraced the ADF's and Veteran's Group's illicit purpose for opening the limited public venue: to accommodate the Christian monument while simultaneously placing barriers between the City and an "undesirable" competing monument.

92. That same evening, the City permitted its personnel to have another off-the-record conversation with Andy Parrish, who promptly announced the matter:



Defend Veterans Park
February 20, 2017 · 🌐

DEAL REACHED!!! WE HAVE THE VOTES!!! VETS CLUB ON BOARD!!! Details tomorrow 5:30 pm at the Vets club. Action at the Council meeting at 6:30 pm. Please come and show your support! Sorry, I have to be vague, but some out-of-state group(s) have become obsessed with this page. #JoeGregory #WeAreBellePlaine

93. The fact that the votes were resolved ahead of the Enacting Meeting (defined and detailed below) indicates that there were off-the-record deliberations. This runs afoul of Minnesota's open meeting laws. Minn. Stat. Ann. § 13D.01 ("All meetings, including executive sessions, must be made open to the public"); <u>Prior Lake Am. v. Mader</u>, 642 N.W.2d 729, 735 (Minn. 2002) ("The Minnesota Legislature clearly intended that *all* meetings of public agencies be open, with rare and carefully restrained exception") (emphasis in original); and Minn. Stat. Ann. § 13D.06 (penalties for violating the open meeting law).

94. The City did not document these secret deliberations. C.f. Minn. Stat. Ann. §

13D.05 Subd. 3 (Requiring that City document a closed meeting by publishing "A list of members and all other persons present at the closed meeting.")

95. Nor did the City record these illicit off-the-record meetings.  C.f. id. (requiring closed meetings be recorded and requiring the recording be preserved for eight years).

96. Or, if these records exist, the City withheld them in discovery.

## The Enacting Meeting and the return of the Christian monument

97. On the evening of February 21, 2017, the City Council held a meeting (the "**Enacting Meeting**") to determine whether to adopt the Veteran's Group's and ADF's proposal, as modified by the City Attorney and the City Administrator.

98. Shortly before the meeting, at around 12:47 PM, TST called the City Attorney to remind the City of its intent to place a display if the Park was opened to private monuments.

99. The City Attorney conveyed this notice to the City at 12:47 PM.

100.　　The City changed the proponents' proposed policy so that donors did not need to meet any qualifications.  Enacting Meeting at 39:10 - 42:37 and 43:20 - 43:40.

101.　　Councilmember Coop expressed concern with the concept of promoting

any religious messaging on city property, partly because it would involve a gamble of constitutional magnitude which the City should not be making.  44:00-49:26.

102.    Notwithstanding Councilmember Coop's objection, the City adopted Resolution 17-020 by a 3-1 vote (Councilmember Chard was absent). **EXHIBIT 7** (Resolution 17-020, Establishing a policy regarding a limited public forum in Veteran's Memorial Park, the "**Enacting Resolution**.")

103.    The Enacting Resolution includes five provisions which shed light on its discriminatory purpose.  See id. at p. 2:

(1) It limits the size of private displays to 3' wide x 2' deep x 3' tall.  This was included because these are the precise measurements of the Christian monument.  The City would suffer no competing monuments to eclipse its preferred, Christian, viewpoint.

(2) The displays must be made of stone, concrete, metal, or some combination thereof.  This was included because the Christian monument uses these materials.

(3) The displays must be removed within one year of approval.  This was included to minimize the City's exposure to an "undesirable" monument.

(4) The displays must be the subject of a $1,000,000 insurance policy.  This

was included because the Veteran's Group already had a $1,000,000 policy and because it would make a competitor monument more expensive.

(5) The Enacting Resolution provides that the application fee would be non-refundable.  This will become important later.

104.     Mayor Meyer would later explain that the City's contemplated purpose of the Enacting Resolution was, "basically, so the Cross could stay in the Park." See June 5, 2017 meeting ("**Objection Meeting**") at 9:45 - 9:55.

## TST's involvement

105.     Two days after the City enacted the Enacting Resolution, on February 23, TST issued an application to install a display which was overtly Satanic, but tastefully so ("**TST's Display**.")  **EXHIBIT 8**.  Upon completion, TST's Display would look like this:



106.     The plaque reads: "In honor of Belle Plaine veterans who served to defend
the United States and its Constitution."

107.     Four days after TST's application, on February 27, the Veteran's Group
submitted their application to replace the Christian Monument.  **EXHIBIT 9**.

108.     Due to postage time, the City received TST's application after the
Veteran's Group's application.

109.     On February 29, the City promptly accepted the Veteran's Group
application, but withheld notice to that effect for one month.  **Id.**

---

110.     Meanwhile, the City struggled with whether to accept TST's competing proposal.

111.     During this period, it is believed that the City subjected TST's application to greater scrutiny than the Veteran's Groups' application.

112.     On March 9, 2017, Councilmember Stier announced an objection to TST's application because it failed to meet a "condition listed in our policy." EXHIBIT 10.

113.     This was a pretext to conceal a religious objection.   Recall, Councilmember Stier only voted to adopt the limited public forum after requesting and receiving assurances that there would be no Satanic monuments in the Veterans Park.  See Adopting Meeting at 49:36-50:40.

114.     Those assurances were unfounded because the City had removed any qualifications on donors in a sober decision to follow Mr. Vose's legal advice. EXHIBIT 11; see also Adopting 51:35-52:11 (explaining why that qualification was wildly unconstitutional).

The Display's Satanic motivations and nature

115.     As the Court addressed in the order of dismissal (Doc. 46), part of TST's case will require proving that the Display has Satanic motivations and a Satanic

nature.  This requires some detail on what it means to be "Satanic."

116.    The following is not an invitation to litigate the truth, the reasonableness, or the centrality of the Display to TST's beliefs or practices.  E.g. Employment Div., Dep't of Human Res. of Oregon v. Smith, 494 U.S. 872, 887, 110 S. Ct. 1595, 1604 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.")

117.    Instead, the following is only to correct the original complaint's pleading deficiency *that* offering the Display was an exercise of TST's religious beliefs and, therefore, the exclusion of the Display was an actionable Free Exercise Clause violation.  See Doc. 46 at p. 9.

118.    TST shares with all other Satanic groups a veneration for the biblical concept *ha satan* (literally: "the adversary" or "the accuser.")

119.    *Ha satan* is a description of being, not a particular individual.

120.    Satanism, broadly, can be roughly divided into "nontheistic" and "theistic" groups.

121.    Nontheistic Satanists venerate the concept of the Biblical Satan and may participate in ritual, but do not literally worship the divine entity that Christians

identify as "The Devil" and do not have any expectation that participating in ritual, by itself, will affect objective reality.

122.     Theistic Satanists differ from nontheistic Satanists by taking the extra step to literally worship a deity that Christians identify as "The Devil."  If they participate in ritual magic, a theistic Satanist will believe that the ritual, by itself, causes an effect on objective reality.

123.     Satanists—nontheistic or otherwise—believe that authority is to be rebelled against ("accused") if it is tyrannical.

124.     It is up to the individual Satanist to determine when something is "tyranny."

125.     This is an inversion of Christian norms, which holds that authority— particularly divine authority—is not to be questioned.

126.     TST and its membership are nontheistic Satanists, with an added influence by the philosophy of the Enlightenment Thinkers.

127.     The core philosophy behind TST's Satanism is in propounding those elemental propositions that—we believe—all nontheistic Satanists can agree upon: the pursuit of "justice" and "empathy" is "good" and our worldview should be determined exclusively by reason, with room to grow or change based on new

evidence.

128.     In this worldview, TST shares much with the Founding Fathers.  This great nation began as an act of insurrection against a tyrant-king who claimed divine authority.  The Founding Fathers pursued of justice and egalitarianism for all.  Replace George Washington with Satan, and TST's membership sees no substantive difference.

129.     This worldview naturally results in a profound agreement with the bedrock principles that make America great.  Thus, TST is deeply patriotic, and genuinely so.

130.     But despite holding these ideals in the highest esteem, TST makes no claim to having the "highest ideal" or "divine truth," and will vigorously defend religious freedom in its many forms.

131.     This commitment to pluralism is rooted in a respect for the individual, but is accompanied by an unflinching demand for reciprocity.

132.     All of the foregoing culminates in a religious conviction for TST to present its competing worldview wherever the government lends its weight of authority (even if temporarily) to a particular religious viewpoint.

133.     In this case, that conviction culminated in making an offer that TST knew

that the City couldn't constitutionally refuse: a Satanic monument to contrast a Christian one.

134.     TST's efforts have been successful elsewhere.  When Councilmember Stier expressed concern about Satanic monuments in Detroit during the Adopting Meeting, he was referring to TST's equal participation in Detroit's nativity scene–an annual tradition going back to 2014.

135.     Thus, TST's efforts to place a Satanic monument in the Veterans Park was a bona fide expression of the core tenet to demand equal accommodation whenever a government opens the door to religion.

136.     Beyond the motivations behind TST's efforts to install the Display, the Display is itself Satanic because it prominently features the inverted pentagram (a well-known Satanic symbol).

137.     The inverted pentagram is a symbol of religious significance to TST and its membership.

138.     TST's primary emblem is the sabbatic goat, superimposed over an inverted pentagram:



139.    The pentagram, i.e. the non-inverted one, is an old symbol of religious significance which has been used by many faith traditions since at least the Ancient Greeks.

140.    Broadly, the pentagram is symbolic of health, virtue, and–uniquely to Christians–the five wounds of Christ.

141.    Éliphas Lévi, a late-Eighteenth Century occultist to whom TST owes much, explained the difference between a pentagram and an *inverted* pentagram in his seminal work *Dogme et Rituel de la Haute Magic* ("Transcendental Magic: Its Doctrine and Ritual") (1854):

> [It] is the hieroglyphic sign of the goat of black magic, whose head may be drawn in the star, the two horns at the top, the ears to the right and left, the beard at the bottom.  It is the sign of antagonism and fatality.  It is the goat of lust attacking the heavens with its horns.

See id. (translation by Aleister Crowley, *The key of the mysteries* (1959)).

142.    Thus, the inverted pentagram has been associated with antagonism to

divine authority (also an eminently Satanic concept as discussed above) since well before TST began.

143.    The inverted pentagram became popularly associated with Satanic thinking in American culture through the works of Anton LaVey and his Church of Satan, albeit through pop culture intermediaries.

144.    The meaning of the inverted pentagram was not lost on the City. Everyone at the City knew that this memorial is a Satanic memorial because of it and not just because of the donor.

145.    There was also meaning behind the cube.  It stands for the perfection of human intellect and spirit, a statement of human supremacy over the divine.

146.    As discussed at length above, human supremacy over the divine is core to Satanic philosophy.

147.    For the foregoing reasons, TST's efforts to have the City install the Display alongside the Christian monument was an expression of its core religious tenets.  And, just as importantly, the City recognized this at all stages.

<u>The acceptance of TST's Display and ensuing construction</u>

148.    On March 29, the City issued notice that it has accepted TST's proposal. **EXHIBIT 12**.  TST's letter of acceptance provides that TST may "emplace a

display within the Limited Public Forum at Veterans Memorial Park," which would first be open for private monuments on April 3, and that TST's permit "is good for one year from the date of this letter."

149.　　The City also issued the same notice to the Veteran's Group. **EXHIBIT 13**.

150.　　On April 8, the Christian monument returned to the Park.

151.　　Meanwhile, in reliance on its permit, TST got to work on arranging for the construction of its monument.

152.　　From about March 29 to about April 19, 2017, TST obtained competing offers from two artists to build the Display. Both agreed that it would involve $10,000 in materials and $20,000 worth of labor (including construction and transportation).

153.　　Adam Volpe agreed to donate his time for the matter.

154.　　It was mutually understood by TST and Mr. Volpe that this was a one-time donation for the particular purpose of creating the Display to put in the Veteran's Park.

155.　　On or about April 19, 2017, TST selected Mr. Volpe.

156.　　At some point between April 19 and June 23, TST crowdfunded for most

(but     not     all)     of     the     costs     of     the     Display.     See

https://www.indiegogo.com/projects/the-satanic-temple-veterans-

monument#/ (Last visited November 26, 2020).

157.     The process of construction took about two months, until about June 23.

158.     Only TST and the Veteran's Group were permitted a right to install their

private monuments in the Veterans Park.

### The public outcry

159.     While TST was busy constructing its Display, the City had a problem with

a developing mob, who took a religious objection to TST's equal participation in

the Veterans Park.

160.     From late-March until late-April, the Veterans Park was occupied each day

by anti-TST protesters who were, "often staking their own handmade crosses

into the ground."  Liz Sawyer, *Star Tribune*, "Belle Plaine veterans park to include

satanic monument: That's the unintended consequence of a small-town saga over

free speech."  (April 29, 2017) (available at https://www.startribune.com/belle-

plaine-veterans-park-to-include-satanic-monument/420823133/) (Last visited

on November 12, 2020).

161.     The controversy also received national press attention.  E.g. Sandhya

Somashekhar, Washington Post, "A small Minnesota town is about to get the nation's first public Satanic Temple monument." (May 6, 2017) (available at https://www.washingtonpost.com/national/a-small-minnesota-town-is-about-to-get-the-nations-first-public-satanic-temple-monument/2017/05/05/b13b75f0-31bf-11e7-9534-00e4656c22aa_story.html) (last visited on November 12, 2020).

162.    Soon after the City granted TST a permit to install the Display, the City began receiving a flood of emails announcing religious objections to TST's Display.  See **EXHIBIT 14** (compiled emails objecting to TST's Display).  To-wit, and just from the first dozen pages:

  (1) There is no good to come from honoring the devil.  **Id.** at p. 1.

  (2) Please don't play any part in making enemies with God.  **Id.** at p. 2.

  (3) [M]y feelings resonate with Father Brian Lynch.  **Id.** at p. 3 (Objection Meeting below).

  (4) God gave them [the Founding Fathers] the rights to become the United States of America and not Satan.  **Id.** at p. 4.

  (5) Satan was thrown out of Heaven by Saint Michael, an Arch Angel, for good reason.  **Id.** at p. 5.

(6) [TST's Display] will cause spiritual and moral harm to Belle Plaine. **Id.** at p. 6; see also **id.** at pp. 10 and 43 (it was a form letter).

(7) By supporting this monument to evil, you are inviting Satan and all the evil spirits that crawl about the world into your community. **Id.** at p. 8.

(8) Satan is the king of all evil and I can't imagine why a monument to honor evil would be put in a Memorial Park. **Id.** at p. 9.

(9) Please do not invite Satan in to your beautiful city. **Id.** at p. 12.

163.     Religious objectors also called the City to notice their objections.

164.     Mayor Meyer ordered the City Administrator to track information about the religious objectors. **Exhibit 15**.

165.     The City did not provide that MS Excel spreadsheet in discovery.

## The Objection Meeting

166.     On June 5, the Council held a meeting (the "**Objection Meeting**") to hear Father Brian Lynch, a Catholic priest who took a leadership role in the campaign to exclude TST from the "all-comer" public forum.

167.     Mayor Meyer prefaced the meeting by introducing that the Council was hearing Father Lynch's objection to TST's Display and giving background on the Veteran's Park controversy.  See Objection Meeting at 8:36-10:08.

168.     Mayor Meyer also prefaced with the note that the City's contemplated purpose of opening the limited public forum was to accommodate the Christian monument:

> We put together what was called a "limited public forum" so that the memorial with the Cross could remain in the Park.

Id. at 9:14-9:22

169.     During the conversations to create the limited public forum, the City contemplated that there was "definitely" going to be "some type of atheist memorial to follow."  Id. at 9:22-9:45.

170.     The Mayor then reiterated (in case there was any shadow of a doubt about whether the City had violated the Establishment Clause):

> Just wanted to have that clarified that the reason that public forum is there is, basically, so the Cross could stay in the Park.

Id. at 9:45-9:55.

171.     Then, the Mayor explained that, before the City could exclude TST's display, the Cross would also have to exit the Park:

> So, if the public forum would go away then, of course, the Cross and any other memorial would have to go away as well.

Id. at 9:55-10:10.

172.     The Mayor then expressed unhappiness about the constitutional

prohibition of governmental favoritism toward a specific religion before introducing Father Bryan Lynch.  Id. at 10:00-10:08 ("that's what we've been up against the last few months.")

173.    The Father opened with thanks to the City (particularly the City Administrator) for being "very cooperative" in assisting the Father in his efforts to exclude TST's Display.  Id. at 10:30-10:48.

174.    Father Lynch then went on to identify that his objection to TST's Display was, specifically, a religious objection.  See, generally, id. at 10:48 – 15:24.

175.    The Father recognized the religious nature of TST:

> Atheistic Satanists do not worship Satan but rather use Satan as a symbol of the rejection of moral authorities and the constraints on human behavior these authorities teach and support.

Id. at 11:36-11:50 (distinguishing from theistic Satanism).

176.    The Father also recognized the religious symbolism on the Display:

> Both [theistic and nontheistic] Satanists use the inverted pentagram as a symbol, a symbol that is almost exclusively associated with evil, the opposition of God, and moral depravity.

Id. at 11:50-12:05.

177.    His objection was rooted in a desire to deter religious competition:

> The inverted pentagrams on the monument proposed by

> The Satanic Temple will prompt young people to consider
> Satanism for themselves.

Id. at 12:04-12:14.

178.    Religious competition from TST was offensive to the local Catholic community:

> It is by way of this public statement that I am officially
> informing the Belle Plaine City Council that the proposed
> Satanic monument will display language offensive to the
> people of Our Lady of the Prairie Catholic Church.

Id. at 14:12-14:25.

179.    The Father then recognized that TST's involvement was one of a spiritual magnitude:

> Thank you for your time; I continue to be available at Our
> Lady of the Prairie Catholic Church in Belle Plaine for
> anyone who desires my help with this issue, or any other
> spiritual matters.  God Bless America and Belle Plaine.

Id. at 15:10-15:24.

180.    The Father's religious objection is understandable.  As a Catholic priest, he propounds a religious doctrine that shuns pluralism and prohibits questioning his absolute moral authority.  TST's doctrine is antithetical to his worldview.  See "The Display's Satanic motivations and nature," above.

181.    Following the Father's statement, the public expressed enthusiastic

agreement with the notion that TST's Display should be excluded because it is Satanic.  Id. at 15:24 – 15:39.

182.     Thereafter, Mayor Meyer advised the Father to share his objection with the Veteran's Group to "help the entire process."  See id. 15:39-16:33.

183.     This was barely-concealed code for, "Go convince the Veteran's Group to remove the Christian monument so the City can exclude the Satanic monument in a manner that appears facially neutral."

## The scheme to exclude TST

184.     Between June 5 and July 13, the City and Father Lynch coordinated with the Veteran's Group to remove the Christian monument so the City could exclude TST's Display in a manner that would appear facially neutral.

185.     On information and belief, City personnel participated in these conversations and emphasized the importance that the Christian monument be removed so that it would outwardly appear that the exclusion of TST's Display was not the product of religious discrimination or viewpoint discrimination.

## Notice of the Display's completion and, shortly later, the removal of the Christian one

186.     On or about June 23, 2017, the construction of TST's display was completed.

187.     On June 29, TST (unaware of the City's scheme to exclude the Display) notified the City that the Display was complete and expressed hope for a smooth installation process.  **EXHIBIT 16**.

188.     Over the next couple of weeks, the parties corresponded about the installation.

189.     During this time, the City's staff did not notify TST about the scheme to exclude the Display.

190.     Meanwhile, the City pressed the proponents of the Christian monument to remove the Christian monument from the Veterans Park, so the City could exclude TST's Display.

191.     On July 14, the Christian monument was quietly removed one day ahead of dueling rallies, both for and against TST's Display.  See Anthony Lonetree, *Star Tribune*, "Statue with Cross Abruptly removed from Belle Plaine before protest" (available at https://www.startribune.com/with-dueling-rallies-looming-statue-featuring-cross-removed-from-belle-plaine-park/434672183/) (last visited November 16, 2020).

192.     The City coordinated with Andy Parrish on the timing of the removal of the Christian monument.

193.     Immediately following its quiet removal, Andy Parrish broadcasted the fact that the Christian monument had been removed, that it "may" not return, and that he will support "the decision of the city" with respect to whether the Christian monument would return to the Veterans Park:



194.     Also on July 14, the City Administrator notified TST that, on July 17, the Council would be "considering" a resolution to eliminate the limited public forum. **EXHIBIT 17**.

195.     This was the first notice TST received that there was any possibility that the City might not follow through with its promise.

196.     The City Administrator was not entirely forthcoming. The Council was not going to be "considering" whether to rescind the Enacting Resolution on

July 17; the Council had previously (and off-the-record) resolved to rescind it. The July 17 meeting was just a formality.

197.     The off-the-record discussions violated Minnesota's Open Meeting law.

### The Recission Meeting and the exclusion of TST's Display

198.     On July 17, the City held a meeting to quietly shut down the limited public forum (the "**Recission Meeting**.")

199.     This meeting was just three days after the quiet removal of the Christian monument and just four days before TST's Display was to be installed.

200.     Notably absent from the Recission Meeting was Andy Parrish, Father Brian Lynch, or any of the other community stakeholders that had dominated the prior City Council meetings about the Veterans Park controversy.

201.     The community stakeholders were absent from the Recission Meeting because the City had already coordinated the planning with them, off-the-record, for the specific purpose of resolving how to exclude TST's Display in a facially neutral manner.

202.     Through a consent agenda, the City adopted Resolution 17-090 (the "**Recission Resolution**.") Id. 3:06-3:14 and 3:37-3:44; see also **EXHIBIT 18** (the Recission Resolution).  A "consent agenda" precludes discussion of the matters

addressed in the resolution.

203.     The Recission Resolution is prefaced by a statement that the intent behind the Enacting Resolution was "to permit private memorials or displays expressing views in keeping with the Park's purpose;" but, since then, "the City Council has determined that allowing privately-owned memorials . . . no longer meets the intent or purpose of the Park." **Id.**

204.     That was a half-truth.  The original intent of the Enacting Resolution was that private memorials, exclusively from a Christian viewpoint, would be "in keeping with the Park's purpose;" and introducing a competing Satanic viewpoint would not.  See Councilmember Stier's comment at the Adopting Meeting ("[H]ow can we up here, be assured that, number one, these [Satanic] monuments won't go into that Park?") and Mayor Meyer's comment at the Objection Meeting (the City adopted the Enacting Resolution "basically, so that the Cross could go back in the Park"); see also, generally, **Exhibit 1** (the original resolution), **Exhibit 10** (Councilmember Stier's objection to TST's equal participation), **Exhibit 14** (public objections to TST's Display because it is Satanic), **Exhibit 15** (Mayor Meyer's poignant interest in the religious objections against TST's equal participation), and **Exhibit 7** (the City resolved to modify

the original plan so it would conform to this unconstitutional purpose).

205.     Upon the City's decision to grant a permit to place TST's Display, the original intent was disrupted.  Hence the Recission Resolution.

206.     The Recission Resolution also includes a statement that:

> the City Council has also determined that the continuation of the limited public forum may encourage vandalism in the Park, reduce the safety, serenity, and decorum of the Park, unnecessarily burden City staff and law enforcement, and negatively impact the public's health, safety and welfare.

**Exhibit 17**.

207.     This is a mischaracterization.  The City did not find that "the limited public forum" would cause these issues, the City found that protestors against TST's Display would cause them.

208.     Thus, the City's "findings" in the Recission Resolution are a mere fabrication to conceal the real basis for the Recission Resolution.  The real basis for the Recission Resolution was twofold: (1) to yield to a heckler's veto; and (2) to discourage Satanism.

209.     The Recission Resolution also states that there was a "full discussion thereof."  Id.  This is plainly false.  The "full discussion" consisted exclusively of reading the title of the resolution and enacting it alongside such other "hot topics

meriting national attention" as "Authorizing the Close of Fund 534 and Transfer Remaining Balance" and "Accept Cash Donation from Friends of the Library for Library Improvements."

210.     Last, the Recission Resolution reverses position on the Enacting Resolution's application fee.   Compare Enacting Resolution at p. 2 ("The application fee . . . is non-refundable"); with Recission Resolution at ¶ 2 ("All applications fees . . . will be reimbursed.")

211.     In doing so, the City recompensated the Veteran's Group's application fee for their trouble.

212.     It was also a tacit admission of guilt.

213.     The next morning, the City issued notice that the limited public forum had been shut down.  **EXHIBIT 19** (prelitigation exchanges between the parties).

214.     The City also issued a press release.  **EXHIBIT 20**.  The press release speaks for itself: the City closed the park to "bring this divisive matter to closure."  This excludes any doubt about whether the City had unconstitutionally yielded to a heckler's veto.

215.     Had TST's Display venerated Jesus instead of Satan, the City never would have enacted the Recission Resolution.  TST's Display, if uncontroversial, would

still be affixed to the Veterans Park grounds today, alongside the Christian monument and any other private displays the citizens of Belle Plaine found suitably inoffensive.

216.     Had the City honored its permit, regardless of controversy, TST would have benefitted from substantial reputational gains for placing the first Satanic monument on public grounds.

217.     Even if TST's Display was removed the next year, TST would have recognized greater public awareness and, therefore, greater donations.

218.     In the aftermath of this controversy, residents and shopkeepers of the City continued (and still continue) to display facsimiles of the Christian monument. For these individuals, the controversy was never really about honoring Belle Plaine Veterans.  It was always about leveraging the government to give a Christian viewpoint the access to the public sphere, to the exclusion of a competing Satanic or atheistic viewpoint.

219.     In August of 2017, TST obtained some of the City's internal emails about this matter by a public records request.  Many of those emails are included as exhibits to this complaint.

220.     The City withheld these emails without producing a privilege log, despite

the fact that these emails are responsive to TST's discovery requests.  C.f. FRCP

26(b)(5) (requiring a privilege log to sustain the refusal to produce responsive

discovery).

221.    TST expects that more responsive documents exist, which is subject of a

separate motion to compel.

222.    This litigation timely followed.

### CAUSES OF ACTION

## Count 1: Promissory Estoppel

223.    In its March 29, 2017 letter, the City issued a clear and definite promise

that it would permit TST to install the Display in the Veterans Park for a period

of one year, until March 29, 2018, at which time TST could reapply for another

year.

224.    Just as the City intended for the Veteran's Group to install the Christian

monument based on the Veteran's Group permit, the City intended for TST to

act in reliance on TST's permit.

225.    TST did, in fact, rely on the permit by expending about $10,000 for

materials directly associated with the Display, additional sums for incentives, and

further sums related to construction and transportation of the Display, as well as

calling in a one-time donation of services worth about $20,000.  Moreover, TST expended time and talent in designing and overseeing the construction and acquired a $1,000,000 insurance policy for the purpose of installing the Display.

226.     This reliance was all to TST's detriment.  TST now has a monument honoring Belle Plaine Veterans which no Belle Plaine Veterans are reasonably able to visit because the monument is in Salem, Massachusetts.  Moreover, had TST been the first Satanic organization to install a monument on public grounds, TST would have benefitted from substantial reputational gains and would have recognized increased membership and donations.

227.     Enforcement of the promise is necessary to avoid injustice.  It has been suggested that TST remove the plaque and reappropriate the Display for some other Veteran's memorial.  That would be an insincere use of the Display.  The Display was created as a gift to the City of Belle Plaine for the explicit purpose of honoring Belle Plaine Veterans.  Not "Belle Plaine Veterans, or whoever else would have us."  Additionally, the reason behind the City's exclusion of the Display was the product of unjust (and unconstitutional) religious discrimination or viewpoint discrimination.

228.     Based on the foregoing, the Court should minimally order the City to

honor its promise and reissue a one-year permit for TST to install its Display for one year, at which time it can reapply for another one-year permit

229.    In fairness, the Christian monument should enjoy the same access to the Park.  The Christian monument had 10 months of exclusive access; so, after 10 months, the Court should require or allow the City to reissue a permit to the Veterans Group for the same amount of time that TST's Display is in the Park.

## Count 2: Violation of the Free Speech Clause

230.    Regardless of whether the Court finds that TST's conduct was religious or whether the City's actions were tainted by religious discrimination, the City enacted the Recission Resolution because of the public's confused and angry reaction to the notion that TST's Display would enjoy equal access to the Veterans Park.

231.    TST's Display was protected speech on a matter of public concern.

232.    TST's Display was precluded by the Recission Resolution, which was in fact specifically designed to acquiesce to a vocal objection to the nature of TST's Display, an objection which was publicly shared by Councilmember Stier.

233.    The Recission Resolution was created for the unreasonable and discriminatory purpose of excluding, specifically, TST's Display to yield to a

heckler's veto.

234.     The Recission Resolution did not impact the Christian monument because the City had coordinated its removal before the City enacted the Recission Resolution.

235.     The Recission Resolution was narrowly crafted to exclude only TST's Display.

236.     Even if the Court finds that the Recission Resolution was not a content-based regulation, it is still indefensible because it was not the product of a legitimate study designed to cure societal ills, which only happen to be caused by speech, in a content-neutral manner.  E.g. <u>Krantz v. City of Fort Smith</u>, 160 F.3d 1214, 1221 (8th Cir. 1998).

237.     For any or all of the above reasons, the Court should declare that the City engaged in a Free Speech Clause violation by substantially interfering with TST's ability to engage in speech with the purpose of discouraging the contents therein (or, alternatively, by creating unreasonable time, place, or manner restrictions of speech) and find the City liable under 42 USC § 1983.

## **Count 3: Violation of the Free Exercise Clause**

238.     Assuming the Court agrees that TST had a religious motivation to erect

the Display, the Free Exercise Clause has also been offended.

239.     TST is a religious organization with core tenets which compel TST to present its competing viewpoint wherever–and to the extent that–a government permits a Christian viewpoint into the public sphere.

240.     For TST, installing the Display was an expression of its core religious beliefs.

241.     The City substantially burdened TST's ability to present a competing viewpoint to the Christian monument by adopting the Enacting Resolution, "basically so that the Cross could go back into the Park," but adopting the Recission Resolution with an impermissible motivation to preempt TST's Display.

242.     Following the Recission Resolution, TST could not lawfully install the Display in the Veterans Park.  This precluded TST from expressing its core religious beliefs.

243.     Further, the City substantially burdened TST's ability to present a competing viewpoint to the Christian monument by including in the Enacting Resolution an at-will termination of the policy, a requirement of a $1,000,000 insurance policy for a display that could not reasonably have a replacement value

in excess of $50,000, and placing a one-year limit on permitted displays–all with the motivation to limit the City's exposure to an "undesirable" religious viewpoint.

244.     Moreover, the City substantially burdened TST's religious activity by permitting a Christian monument exclusive access to the Veterans Park for about ten months (from August 2016 to January 2017 and from April 2017 to mid-July 2017), but enacting the Rescission Resolution to preclude TST from having even a moment of equal access.

245.     For any or all of the above reasons, the Court should declare that the City engaged in a Free Exercise Clause violation by substantially interfering with TST's ability to engage in religious speech with the purpose of discouraging Satanism and find the City liable under 42 USC § 1983.

## Count 4: Violation of the Establishment Clause

246.     By adopting the Enacting Resolution for the purpose of promoting Christianity, the City violated the Establishment Clause.  U.S. Const. Amend. I ("Congress shall make no law respecting an establishment of religion.")

247.     A government violates the Establishment Clause by permitting the installation of a new monument with religious significance for the purpose of

advancing that religious message.  E.g. <u>McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky.</u>, 545 U.S. 844, 125 S. Ct. 2722 (2005); c.f. <u>Van Orden v. Perry</u>, 545 U.S. 677 (2005) and <u>Am. Legion v. Am. Humanist Ass'n</u>, 139 S. Ct. 2067 (2019) (there would be no constitutional violation if the Christian monument was installed 40+ years ago without a contemporaneous religious objection).

248.     Over 35 years ago, Justice O'Connor explained precisely why the City's conduct is an egregious affront against our constitutional norms:

> Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message.

<u>Lynch v. Donnelly</u>, 465 U.S. 668, 688, 104 S. Ct. 1355, 1367 (1984) (O'Connor, J., concurring)

249.     The core concept of the Enacting Resolution was put together by the Veteran's Group and the ADF, whose stated purpose was to have the City advance the religious message proffered by the Christian monument, to the exclusion of an atheistic or Satanic competing viewpoint.

250.     Councilmember Stier only voted to adopt the proposal after receiving assurances that the proposal would exclude both atheistic and Satanic displays.

251.    Mayor Meyer stated, in a televised broadcast, that the Enacting Resolution was adopted "basically, so the Cross could stay in the Park."  This was a plain statement that the City had adopted the impermissible religious purpose of the Veteran's Group and the ADF.

252.    The City's modifications to that proposal, which culminated in the Enacting Resolution, did nothing to purge the root intent of promoting Christianity.

253.    Instead, the Enacting Resolution conspicuously preserved the criteria which were designed to accommodate the Christian monument while deterring others: other monuments must be no bigger than the Christian monument, must be the subject of an incredible insurance policy which the Veteran's Group already had, and must be made of materials that comprised the Christian monument.

254.    Two of the three modifications put forward by the City were in contemplation of limiting the City's exposure to an "undesirable" monument (the one-year limit for permanent fixtures, and the City's unilateral right to terminate the policy).   Emphatically, limiting the City's exposure to an "undesirable" monument is the opposite of purging the root intent of promoting

Christianity.

255.     At all times, the City had conveyed

256.     For the foregoing reasons, the Court should declare that the City engaged

in an Establishment Clause violation by acting with the stated purpose of

promoting Christianity and find the City liable under 42 USC § 1983.

## Count 5: Violation of the Equal Protection Clause

257.     TST is similarly situated to the Veteran's Club because both organizations

offered to donate private memorials to the City's veterans, both of which were

through a religious lens.  It is a distinction without a lawful difference that TST's

Display was Satanic whereas the Veteran's Group was Christian.

258.     TST is a suspect class, either because it was uniquely targeted because of

its religious identity or because it was on the wrong end of a majoritarian political

process.  E.g. Plyler v. Doe, 457 U.S. 202, 218 at fn. 14, 102 S. Ct. 2382, ___

(1982).

259.     Even if TST was not a suspect class, TST's right to present a competing

religious message to the Christian monument is a "fundamental right" to which

strict scrutiny also attaches.  Id. at fn. 15 (a "fundamental right" includes those

explicitly stated in the Constitution).

260.    Moreover, the "procedural or substantive" departures test compels finding an Equal Protection Violation.  See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267, 97 S. Ct. 555, 564-65 (1977).

261.    The City granted the Veteran's Group and not TST full access to its policymaking personnel for the purpose of crafting the policies at issue.  This is both procedurally and substantively unsound: the Christian group got full access to tip the scale in its favor, all the while TST was left in the dark.

262.    Further, the City granted a permit for the Christian monument immediately, whereas TST's application took one month of deliberations.

263.    These departures are strong evidence that the City had a discriminatory purpose as a motivating factor when resolving to adopt the Enacting Resolution and the Recission Resolution.

264.    More particularly, the City's decision to adopt the Enacting Resolution was tainted by an impermissible motivating factor of promoting Christianity.

265.    Likewise, the City's decision to adopt the Recission Resolution was the culmination of a months-long plan to satisfy Councilmember Stier's stated concern: "how can we up here, be assured that, number one, these [Satanic] monuments won't go into that Park?"

266.    At all stages of the events giving rise to this litigation: from the Adopting Meeting to the Recission Meeting, the City took every action with the specific purpose of accommodating Christianity and excluding Satanism while outwardly appearing like it was being neutral.

267.    The problem–for the City–is that no amount of outward appearances can purge the invidious twin motives behind the Enacting Resolution and the Recission Resolution.  The Court's duty is to "distinguish a sham secular purpose from a sincere one." Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308, 120 S. Ct. 2266, 2278 (2000); see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534, 113 S. Ct. 2217, 2227 (1993) ("Facial neutrality is not determinative")

268.    The City had no secular purpose in the events which gave rise to this litigation.

269.    For the foregoing reasons, the Court should declare that the City engaged in an Equal Protection violation by giving Christians groups favorable governmental treatment over a Satanic group and find the City liable under 42 USC § 1983.

## **Count 6: Violation of the Due Process Clause**

270.    By providing TST with a one-year permit, the City conveyed to TST a

vested, protectible property right to which the Due Process Clause attaches.  See

generally U.S. Const. Amend. XIV ("nor shall any State deprive any person of .

. . property[] without due process of law.")

271.    For this count, we assume that the City's right to terminate the permit was

not the product of an unconstitutional desire to limit the City's exposure to TST's

Display.

272.    If this assumption is false (i.e. it was), then no amount of procedural

protections can save the City from liability because that would create an

irresolvable substantive due process problem.

273.    By issuing the permit, the City granted TST an "entitlement" which the

City could not later take away without due process.  E.g. Bell v. Burson, 402 U.S.

535, 539, 91 S. Ct. 1586, 1589, 29 L. Ed. 2d 90 (1971) (recognizing "the general

proposition that relevant constitutional [due process] restraints limit state power

to terminate an entitlement whether the entitlement is denominated a 'right' or a

'privilege.'")

274.    Thus, the Due Process Clause vested TST with a right to be heard at a

meaningful time and in a meaningful manner before the City could lawfully revoke the permit.  E.g. <u>id.</u>

275.     The City should have given TST a reasonable notice before engaging with the Veteran's Group and the ADF.  Instead, the notice that TST received was on July 14–well after the City began coordinating the quiet removal of the Christian monument to justify the exclusion of TST.

276.     Or, the City should have given TST a reasonable right to participate in whatever investigation (if any) which culminated in findings that "allowing privately-owned memorials . . . no longer meets the intent or purpose of the Park;" and "the limited public forum may encourage vandalism [etc.]"  **Exhibit 18**.  Instead–assuming these are not just fabrications to appear neutral–TST was excluded from this investigation and was only given perfunctory notice by the Recission Resolution.  **Exhibit 18**.

277.     Or, the City should have afforded TST a meaningful opportunity to engage in the discussions which culminated in the Recission Resolution (either during the Recission Meeting or during the off-the-record conferences).  Instead, TST learned about the City's plan to enact the Recission Resolution only after it was unofficially agreed upon in off-the-record discussions; and, even if TST had

attended the Recission Meeting, the Recission Resolution was officially enacted without any opportunity to discuss.

278.     Or, the City should have given TST a right to appeal the Recission Resolution.  Instead, TST was given perfunctory notice that the matter was adversely decided and that the public forum area had been eliminated.  **Exhibit 18**.

279.     Failing any of the above, or some other constitutionally meaningful process, it was a Due Process violation to unilaterally revoke the permit.  This is true even if the Court upholds the Enacting Resolution's claim to reserve a right to unilaterally terminate the permit.

280.     For the foregoing reasons, the Court should declare that the City engaged in a procedural Due Process Clause violation by depriving TST of the right to participate in the limited public forum without a constitutionally meaningful hearing and find the City liable under 42 USC § 1983.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays this Court enter judgment against the City as follows:

1. Find the City liable for promissory estoppel and order specific performance; or, failing that, compensatory damages as detailed further below.

2. Declare the Recission Resolution void as the product of an unconstitutional and discriminatory scheme to exclude TST from equal participation in the limited public forum; or as an unreasonable regulation of protected speech.

3. Declare the following provisions in the Enacting Resolution void as the product of an unconstitutional and discriminatory scheme to afford preferential treatment for Christianity:

    (1) Private displays may not exceed 3' wide x 2' deep x 3' tall.  This was included because these are the precise measurements of the Christian monument.

    (2) The displays must be removed within one year of approval.  This was included to minimize the City's exposure to an "undesirable" monument.

    (3) The displays must be the subject of a $1,000,000 insurance policy.  This was included because the Veteran's Group already had a $1,000,000 policy and because it would make a competitor monument more expensive.

4. Enjoin the City to:

    (1) Reopen the Veterans Park limited public forum;

    (2) Enjoin the City to allow both TST and the Veteran's Group to permanently affix their monuments to the Veterans Park grounds; and

(3) Permit up to eight additional permanent memorials to the veterans of Belle Plaine, MN to be granted on a first-come, first-served basis without consideration of the nature of the donating party or the design of the monument, provided only that (1) the design is a memorial to Belle Plaine Veterans and (2) the City may collect a reasonable application fee.

5. Restrain the City from closing the limited public forum for at least one year after it is reopened; and, only then, after affording donors a right of reasonable notice and a right to a hearing on the plan to close the limited public forum in the Veterans Park.

6. Unless the Court orders specific performance as described above, order compensatory damages in an amount of at least $75,000, plus prejudgment and postjudgment interest at lawful rates to compensate TST as follows:

(1) Out-of-pocket costs in creating the Display;

(2) Any incentive costs associated with soliciting donations for the Display;

(3) Any fees charged by Indie Gogo for accommodating the crowdfunding campaign;

(4) A reasonable value for Adam Volpe's one-time donated services;

(5) Any costs related to transporting the Display from Volpe's gallery to

TST's headquarters;

(6) Reasonable administrative costs associated with the creation and transportation of the Display; and

(7) The reputational harm the City caused TST by withholding an opportunity to erect the first permanent Satanic monument on public grounds.

7. Declare, pursuant to 28 USC § 2201, that:

(1) the City violated the Free Speech Clause by adopting the Recission Resolution to acquiesce to a heckler's veto or discourage Satanism;

(2) the City violated the Free Exercise Clause by adopting the Recission Resolution to discourage Satanism;

(3) the City violated the Establishment Clause by adopting the Enacting Resolution to promote Christianity;

(4) the City violated the Equal Protection Clause by giving favorable treatment to Christian groups over a similarly-situated Satanic group; and

(5) The City violated the Due Process Clause by revoking the permit without giving TST a meaningful right to be heard.

8. Pursuant to FRCP 54, 42 USC § 1988, and MSA § 549.01, order the City to compensate TST for its attorney's fees and related expenses incurred in having

to bring this matter to the Court's attention.

9.  Pursuant to FRCP 54, order the City to compensate TST for its taxable costs

    incurred.

10. And for all other relief to which TST may be entitled.

Respectfully submitted on December 1, 2020,
on behalf of The Satanic Temple
By:  /s/ Matthew A. Kezhaya

Matthew A. Kezhaya, ABA# 2014161
 KEZHAYA LAW PLC
100 S. Fifth Street, 19th Floor
Minneapolis, MN 55402
phone:   (479) 431-6112
facsimile:   (479) 282-2892
email:   matt@kezhaya.law

**ROBERT R. HOPPER AND ASSOCIATES LLC**

/s/Jason S. Juran

Jason S. Juran, Esq. (MN # 397935)
Robert R. Hopper, Esq. (MN # 208760)
333 S. Seventh Street, Suite 2450
Minneapolis, MN 55402
P: (612) 455-2199
F: (612) 455-1689
E: jasonjuran@robertrhopper.com
E: robert.hopper@robertrhopper.com

<u>CERTIFICATE AND NOTICE OF SERVICE</u>

    **NOTICE IS GIVEN** that I, Matthew A. Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on December 1, 2020 which sends service to registered users, including all other counsel of record in this cause.  <u>/s/ Matthew A. Kezhaya</u>

## TABLE OF EXHIBITS

**Exhibit no.**                                                                                    **Page no.**

1.  Proposed resolution .................................................................................. 1

2.  Notice of closed session meeting ............................................................ 6

3.  Email adding the kill switch .................................................................... 8

4.  Email indicating the City knew that TST would be placing a monument .... 10

5.  Email adding the 1-year limit ................................................................ 12

6.  Email requesting correction of "the sticking points" ............................ 15

7.  Resolution 17-020 (the "**Enacting Resolution**") ............................ 18

8.  TST application ...................................................................................... 22

9.  Veteran's Group application .................................................................. 27

10. Email from Stier to City Administrator ................................................ 31

11. Email from City Administrator explaining why all
    qualifications were removed ............................................................... 34

12. City notice of acceptance to TST ........................................................ 37

13. City notice of acceptance to Veteran's Group .................................... 39

14. Deluge of religious objection emails (compilation) ......................... 41

15. Emails about Mayor Meyer's orders to track telephone calls
    announcing religious objections ........................................................ 105

16. TST notice of completion ................................................................... 109

17. City notice of forthcoming recission meeting .................................. 114

18. Resolution 17-090 (the "**Recission Resolution**") ........................ 118

19. City notice of Recission Resolution to TST ...................................... 120

20. Press release ..................................................................................... 126

21. Notice of conventional filing placeholder (video recordings and referenced
    clips of the Adopting Meeting, Enacting Meeting, Objecting Meeting, and
    Recission Meeting) ........................................................................... 128