## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| The Satanic Temple, | Case No. 19-CV-01122 (WMW/LIB) |
| Plaintiff, | |
| v. | **DEFENDANT CITY OF BELLE PLAINE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| City of Belle Plaine, Minnesota, | |
| Defendant. | |

## INTRODUCTION

The only remaining question in this case is simple: Should this Court apply the equitable remedy of promissory estoppel against the City of Belle Plaine based on The Satanic Temple's allegation that it relied on a permit issued by the City under a policy that the City subsequently rescinded? The answer must be no.

First, the City's permit did not create a clear and definite promise. The permit was issued under the City's limited public forum policy. Although that policy granted permittees the option to place a display in the park for a period of up to one year, it also allowed the City to end the limited public forum and revoke any permits. Given that the permit was revocable at will, it created no promise at all.

Second, the Temple could not and did not reasonably rely on the permit. The Temple's directors testified that they understood the City could end the limited public forum and revoke the permit at any time. With that policy in mind, the Temple's two directors decided to create the display regardless of the City's actions,

used the display to support the Temple's fundraising and marketing efforts, and prioritized exhibiting the display at their Salem Art Gallery. The record simply belies the Temple's post hoc attempt to suggest the Temple believed it was entitled, without caveat, to place the display in the park.

Finally, there is no injustice to correct in this case. The City was not unjustly enriched because the Temple did not confer anything of value to the City. The Temple owned the display and would have remained the owner even if it had placed the display in the park. The City refunded the cost of the permit application. The Temple does not seek damages for the insurance acquired to comply with the permit. The Temple more than recouped the $8,600 it spent designing, building, and coordinating the display by fundraising $12,673 for the display and collecting $182,000 in admissions tickets to its art gallery exhibiting the display.

Because the Temple has failed to show that it reasonably relied on any clear and definite promise made by the City, and the record shows no valid reasons why the Court needs to use its equitable powers to prevent an injustice, the Court should dismiss the remaining claim with prejudice.

# STATEMENT OF FACTS

**A. On February 6, 2017, the City Council considered, but did not vote to approve a limited public forum policy.**

On February 6, 2017, the City Council considered the question of whether to establish a limited public forum in the park.[1] The City Council asked its staff to prepare a draft policy for consideration at its next meeting.[2]

**B. Before the next City Council meeting, the Temple promoted its Cube Display.**

Even before the City Council voted on whether to establish a limited public forum in the park, the Temple had already decided that "we'd like to commission the construction of the veteran's memorial regardless of whichever way the MN vote goes."[3] On February 7, 2017—just a day after the City Council's initial meeting—the Temple announced to news outlets that it was working "to construct a new Satanic display."[4]

---

[1] Declaration of Monte M. Mills ("Mills Decl.") Exs. 35, 36 at CITY000005.

[2] Mills Decl. Ex. 36 at CITY000005.

[3] Mills Decl. Ex. 9 (Dep. Ex. 6, 11:11 p.m.). Any redactions appearing on Mills Decl. Exs. 9–18, 22, 25 and 28–32 reflect communications and documents to, from, or involving Lucien Greaves. Mills Decl. ¶ 3. The person referred to as Lucien Greaves, which is a pseudonym, also uses another pseudonym. *See* Mills Decl. Ex. 1 (L. Greaves Tr. 7:1–3); Mills Decl. Ex. 3 (TST Tr. 114:4–115:5); *id.* Ex. 32 (citing to the disclosures exhibit).

[4] Hemant Mehta, *MN Town Foolishly Votes To Re-Erect Christian War Memorial, So Atheists Will Ask For One, Too,* Friendly Atheist (Feb. 7, 2017), *available at* https://friendlyatheist.patheos.com/2017/02/07/mn-town-foolishly-votes-to-re-erect-christian-war-memorial-so-atheists-will-ask-for-one-too/.

### C. Before it was aware of the outcome of the City Council's vote, the Temple began designing the display and considered making miniatures of the display.

On February 21, 2017, the City Council met to vote on the policy.[5] By mid-day on February 22, 2017—before the Temple became aware of the results of the City Council's vote—the Temple was already obtaining estimates to build the display.[6]

For the Temple, the mere act of creating the display held value, such that "the polices [sic] that were enacted or not enacted at that point were secondary and not relevant to [the Temple's] understanding [] that the ability to create policy [] would be worth it."[7] Indeed, the Temple considered the display to be "more than a statue,"[8] and more akin to "a piece of history."[9]

In order to spread awareness and increase the "high profile"[10] nature of its message, the Temple decided to crowdfund to raise money to pay for the display.[11] Not only did the crowdfunding campaign help the Temple reach "an exponentially

---

[5] Mills Decl. Ex. 36 at CITY000005–6.
[6] Mills Decl. Ex. 3 (TST Tr. 56:2–12); *id*. Ex. 2 (M. Jarry Tr. 56:20–57:7); *id*. Ex. 9 (Dep. Ex. 6 at PLF000010–11).
[7] Mills Decl. Ex. 2 (M. Jarry Tr: 48:16–20, 49:5–10).
[8] Mills Decl. Ex. 14 (Dep. Ex. 11 at PLF000034, 2:22 p.m.); *id*. Ex. 2 (M. Jarry Tr. 94:6–95:5).
[9] Mills Decl. Ex. 9 (Dep. Ex. 6 at PLF000010, 11:11 p.m.).
[10] Mills Decl. Ex. 9 (Dep. Ex. 6 at PLF000012, 1:23 p.m.).
[11] Mills Decl. Ex. 9 (Dep. Ex. 6 at PLF000012, 1:23 p.m.); *id*. Ex. 3 (TST Tr. 27:20–29:7).

larger audience,"[12] but it also helped keep people "interest[ed]" in the Temple's overall mission.[13]

Having recognized the potential to use the display to fundraise for the Temple's initiatives, the Temple also discussed creating miniatures of the display that could be sold to the public.[14] The Temple knew that "we were clearly planning on making this – the statue . . . that was never a question" and it made sense to make miniatures "because we wouldn't make miniatures [] of a statue that we hadn't actually made."[15]

In light of the importance the Temple placed on the mere creation of the display, it is clear that even if the Temple "beg[a]n construction on the assumption that [the City] w[as] not going to vote to shut down the forum,"[16] the Temple "was interested in commissioning the construction of the cube display regardless of the outcome of the vote."[17]

---

[12] Mills Decl. Ex. 10 (Dep. Ex. 7 at PLF000016, 3:43 p.m.).
[13] Mills Decl. Ex. 10 (Dep. Ex. 7 at PLF000018, 7:04 p.m. and 9:47 p.m.); *see also id.* Ex. 1 (L. Greaves Tr. 98:23–99:11); *id.* Ex. 2 (M. Jarry Tr. 58:18–23).
[14] Mills Decl. Ex. 9 (Dep. Ex. 6 at PLF000011, 12:46 p.m.); *id* at Ex. 2 (M. Jarry Tr. 53:4–12, 50:13–51:4, 51:17–23, 52:3–14).
[15] Mills Decl. Ex.2 (Jarry Tr. 53:4–12).
[16] Mills Decl. Ex. 3 (TST Tr. 50:1–13); *id.* Ex. 9 (Dep. Ex. 6).
[17] Mills Decl. Ex. 2 (M. Jarry Tr. 49:11–15); *id.* Ex. 9 (Dep. Ex. 6).

**D.     On February 21, 2017, the City Council established a limited public forum policy.**

Resolution 17-020 (February 21, 2017) established a limited public forum in the City's park. The policy stated that the City "designates a limited public forum in Veterans Memorial Park for the express purpose of allowing individuals or organizations to erect and maintain privately owned displays that honor and memorialize living or deceased veterans[.]"[18] Resolution 17-020 also stated that no display may be installed without first obtaining a permit from the City, that the party requesting a permit is responsible to erect the display upon approval of a permit from the City, and that the requesting party and not the City shall own any display erected in the limited public forum.[19] Resolution 17-020 required that displays must be removed within one year from the date of approval of a permit.[20] Resolution 17-020 specifically stated that, "[i]n the event the City desires to close the limited public forum or rescind this policy, the City . . . may terminate all permits by giving ten (10) days' written notice."[21]

---

[18] Mills Decl. Ex. 37, ¶ 1; *see also id.* Ex.4 (Dep. Ex. 1 (unsigned Resolution)).
[19] *See generally* Mills Decl. Ex. 37.
[20] Mills Decl. Ex. 37, ¶ 7.
[21] Mills Decl. Ex. 37, ¶ 13.

### E. Reason Alliance Ltd. applied for a permit consistent with the limited public forum policy.

Reason Alliance Ltd. applied for a permit consistent with Resolution 17-020.[22] On its application for the permit, Reason Alliance listed its address as "c/o The Satanic Temple, 64 Bridge Street, Salem, MA."[23] The application—which a director of the Temple signed—affirmed that the applicant would comply with the City's limited-public-forum policy.[24] Reason Alliance is a non-profit entity whose mission is to support the mission of the Temple.[25] Reason Alliance and the Temple share the same two directors.[26]

### F. Before the City approved a permit, the Temple's directors understood that the Cube Display might be in Belle Plaine's park for only one year and that it may be required to be removed at any time.

The City's limited public forum policy was clear: The City could require all displays to be removed at any time upon 10 days' notice, and each display would only be authorized for *up to* one year.[27]

---

[22] Mills Decl. Ex. 5 (Dep. Ex. 2); Compl. ¶ 29.

[23] Mills Decl. Ex. 5 (Dep. Ex. 2).

[24] Mills Decl. Ex. 5 at 4; *id*. Ex. 1 (L. Greaves Tr. 44:9–45:12, 46:1–8); *id*. Ex. 2 (M. Jarry Tr. 30:10–22); *id*. Ex. 3 (TST Tr. 18:18–19:5, 32:22–33:9).

[25] Mills Decl. Ex. 3 (TST Tr. 9:5–9).

[26] Mills Decl. Ex. 3 (TST Tr. 9:18–20).

[27] Mills Decl. Ex. 37, ¶ 13 ("In the event the City desires to close the limited public forum or rescind this policy, the City, through its City Administrator, may terminate all permits by giving ten (10) days' written notice of termination to Owner, within which period the owner must remove their display from city property.").

The Temple understood this policy. In an internal email sent before the City approved the permit application, the Temple's directors noted that "[monuments] are only up for 1 year and a request can be made that they all be taken down, in which case, we have 10 days to remove it."[28] And at their depositions, the directors affirmed that the email was accurate[29] and that "everyone on th[at] e-mail would recognize that anytime, upon notice, the cube display might have to be removed within ten days."[30] The Temple's directors also agreed that it was reasonable to expect the possibility that the City could terminate a permit on 10 days' written notice because "that's what the policy says"[31] and the policy did not place any limits on the City's authority to terminate a permit.[32] In other words, the Temple did not—

---

[28] Mills Decl. Ex. 10 (Dep. Ex. 7 at PLF000017, 6:03 p.m.); *see also id.* Ex. 3 (TST Tr. 97:21–98:6 (discussing same email) ("Q: [T]hat e-mail was sent before the City had approved the permit on March 29, 2017, correct? A: Correct. Q: [S]o this e-mail would have been based on the limited public forum policy, not the permit, correct? A: Correct.")); *id.* Ex. 1 (L. Greaves Tr. 104:18–105:17 (discussing Dep. Ex. 7) ("[I]t appears that they're assuming that the [] timeframe may be limited to one year.")); *id.* Ex. 2 (M. Jarry Tr. 67:13–69:15, 74:14–75:19).

[29] Mills Decl. Ex. 2 (M. Jarry Tr. 68:6–10 ("Q: Did you intend that your 6:03 p.m. e-mail to the National Council be accurate? A: I would have intended my emails to the National Council to be accurate.")); *id.* Ex. 1 (L. Greaves Tr. 105:18–106:15).

[30] Mills Decl. Ex. 2 (M. Jarry Tr. 69:11–15); *see also id.* Ex. 1 (L. Greaves Tr. 41:14–23 ("[T]he City can close the limited public forum or rescind the policy with ten-days written notice. Whereupon, the assumption seems to be our display would already be on the property, and we could come retrieve it."), 45:7–25).

[31] Mills Decl. Ex. 1 (L. Greaves Tr. 42:3–8).

[32] Mills Decl. Ex. 1 (L. Greaves Tr. 42:24–43:14); *see also id.* Ex. 2 (M. Jarry Tr. 21:6–10 ("My understanding of the text is what the text says.")); *id.* at 28:10–29:9 (Jarry agrees that the City could terminate a permit by giving ten-days' written notice, and

and could not—expect that a permit would *entitle* it to leave the display up for an entire year. Instead, the Temple expected that after the display was eventually removed—either after a year or by operation of the City's notice—the Temple could bring the display to Salem or sell it.[33]

### G. On March 29, 2017, the City granted a permit to Reason Alliance Ltd.

Belle Plaine's City Administrator sent a letter to Reason Alliance Ltd. on March 29, 2017, notifying that Belle Plaine approved the request for a permit to place a display within the limited public forum in Veterans Memorial Park.[34] The permit stated that "[t]his permit is good for one year from the date of this letter. You may reapply to place another display once this permit is removed."[35] As before, the Temple understood it was a "plausible outcome" that the City would order the display removed before the one-year time limit ran.[36]

### H. The Temple was more interested in showcasing the display in its gallery, where it could charge admission fees to see it, than placing it in Belle Plaine's park, where no admission fees could be charged.

The Temple did not install the display in the park during the months of April or May.[37] And although the construction of the display was complete as of June 23,

---

that it is reasonable to expect that if the City terminated a permit, the owner must remove their display from City property).

[33] Mills Decl. Ex. 2 (M. Jarry Tr. 74:14–75:22 (discussing Dep. Ex. 7) (Mills Decl. Ex. 10) at PLF000019, 3:57 a.m.).

[34] Mills Decl. Ex. 5 (Dep. Ex. 2).

[35] Mills Decl. Ex. 5 at 1 (Dep. Ex. 2).

[36] Mills Decl. Ex. 3 (TST Tr. 92:21–93:15).

[37] *See* Mills Decl. Ex. 3 (TST Tr. 102:7–24); *id*. Ex. 24 (Dep. Ex. 21).

2017,[38] the Temple did not install the display in the park during June or July.[39] This is because the Temple had *no plans* to place the display in the park before the week of August 7–13, 2017.[40] Instead, the Temple's priority was to "get it over to the gallery,"[41] "show it here [in the Gallery] temporarily,"[42] let it "come in the [headquarters] building and be treated like an exhibit while it is here,"[43] and "get it to Salem [Art Galley] for a bit before we send it to Belle Plaine."[44]

The Temple's directors were motivated to place the display in the Salem Art Gallery.[45] Although the Salem Art Gallery is a separate business entity from the Temple, it is owned by the Temple's two directors, Lucien Greaves and Malcolm Jarry, and shares a building with the Temple's headquarters.[46] The Temple believed

---

[38] Mills Decl. Ex. 3 (TST Tr. 98:20–99:17); *id*. Ex. 16 (Dep. Ex. 13).
[39] *See* Mills Decl. Ex. 3 (TST Tr. 102:7–24); *id*. Ex. 24 (Dep. Ex. 21).
[40] Mills Decl. Ex. 3 (TST Tr. 102:7–24); *id*. Ex. 24 (Dep. Ex. 21).
[41] Mills Decl. Ex. 16 (Dep. Ex. 13, 7:08 p.m.).
[42] Mills Decl. Ex. 16 (Dep. Ex. 13, 1:42 p.m.).
[43] Mills Decl. Ex. 25 (Dep. Ex. 22 at PLF000103, 2:57 p.m.).
[44] Mills Decl. Ex. 25 (Dep. Ex. 22 at PLF000103, 1:00 p.m.).
[45] *See, e.g.*, Mills Decl. Ex. 25 (Dep. Ex. 22, 1:00 p.m. ("The memorial is big news right now and I was wondering what you would need to get it to Salem for a bit before we send it to Belle Plaine? . . . I think we'd like to have it here and show it until we send it."); *id*. at 2:57 p.m. ("[I]t would probably come in the building and be treated like an exhibit while it is here.")).
[46] Mills Decl. Ex. 3 (TST Tr. 8:3–15, 11:8–12:3); *id*. Ex. 2 (Jarry Tr. 133:9–11).

that the display could serve as a replacement for a departing exhibit[47] that would draw in crowds[48] and generate money for the Temple.[49]

Why would the Temple delay the placement of the display in the park? First, because the display was not created solely for exhibition at the park, but instead for publicity, the Temple's own enjoyment, and fundraising efforts. And second, because, unlike at the park, the Temple could charge the public a $12 admission fee to the Salem Art Gallery.[50]

## I.  The City Council ended the limited public forum policy.

On July 17, 2017, the City Council unanimously enacted Resolution 17-090 (the "Rescission Resolution"), which stated that "the City Council has determined that allowing privately-owned memorials or displays in its Park no longer meets the intent or purpose of the Park."[51] The Rescission Resolution further stated that "the

---

[47] Mills Decl. Ex. 18 (Dep. Ex. 15, 4:55 p.m. ("I'd like to get it [to the Salem Art Gallery] ASAP while the news is still hot. It will be a great attraction to add especially since Castiglias stuff leaves soon.")). Greaves suggested the cube display be placed indoors because the previous artist's display was leaving the gallery and "the gallery was going to be bereft of art." *Id*. Ex. 1 at 142:1–143:9; *id*. at 143:18–144:1 ("[The cube display] wouldn't necessarily be a replacement [for the departing exhibit]" but "[t]here would certainly be a need [] to fill space in the gallery.").

[48] Mills Decl. Ex. 1 (L. Greaves Tr. 141:15–19 ("[T]here would be better odds of people wanting to see the [cube display] when the time they would go to visit would be in closer proximity to the time that the monument was in the news.")).

[49] *See* Mills Decl. Ex. 1 (L. Greaves. Tr. 134:4–20 (The art gallery charges admission at the rate of $12.00 per person to view exhibitions, including exhibits involving the cube display)); *id*. Ex. 2 (Jarry Tr. 133:9–134:4); *id*. Ex. 3 (TST Tr. 20:22–21:5).

[50] Mills Decl. Ex. 1 (L. Greaves 133:16–134:20).

[51] Mills Decl. Ex. 8 (Dep. Ex. 5).

City Council has also determined that the continuation of the limited public forum may encourage vandalism in the Park, reduce the safety, serenity, and decorum of the Park, unnecessarily burden City staff and law enforcement, and negatively impact the public's health, safety, and welfare."[52] The Rescission Resolution declared that "[t]he policy established in Resolution 17-020 is rescinded," and that "the limited public forum established in the Park is hereby eliminated."[53]

On July 18, 2017, the City Administrator sent a letter to the Temple notifying the Temple that Belle Plaine had adopted the Rescission Resolution eliminating the limited public forum in the park and enclosing a check in the amount of $100 to fully reimburse the Temple for its permit-application fee.[54] The City's July 18, 2017 letter also enclosed a copy of the Rescission Resolution.[55]

## J.    The Temple exhibited the display at its gallery.

Given that the Temple did not intend to place the display in the park until mid-August,[56] the Rescission Resolution did not disrupt the Temple's earlier plans to showcase the display at the gallery in its headquarters. The display has been exhibited at the Salem Art Gallery since approximately July 2017.[57]

---

[52] Mills Decl. Ex. 8 (Dep. Ex. 5).
[53] Mills Decl. Ex. 8 (Dep. Ex. 5).
[54] Mills Decl. Ex. 8 (Dep. Ex. 5); *see also id*. Ex. 43.
[55] *See* Mills Decl. Exs. 8 (Dep. Ex. 5), 43.
[56] *See* Mills Decl. Ex. 3 (TST Tr. 102:7–24); *id*. Ex. 24 (Dep. Ex. 21).
[57] Mills Decl. Ex. 1 (L. Greaves Tr. 32:9–19); see *id*. Ex. 3 (TST Tr. 20:22–21:12) (cube display has been available for viewing at the Salem Art Gallery since July 2017)).

The Temple remained interested in showcasing the display at the Gallery "ASAP while the news is still hot" because "[i]t will be a great attraction to add" to raise the profile of the Temple and support the Temple's financial initiatives.[58] The Temple understood that "there would be better odds of people wanting to see the [display] when the time they would go to visit would be in closer proximity to the time that the monument was in the news."[59] Moreover, because another artist's work was leaving the Gallery, "the gallery was going to be bereft of art."[60] The display "wouldn't necessarily be a replacement [for the departing exhibit]" but "[t]here would certainly be a need [] to fill space in the gallery."[61]

## K. The Temple collected more money from promoting and exhibiting the display than it paid to have the display made.

The Temple paid the artist who designed the display $1,000.[62] The Temple paid the fabricator who made the display $3,600 for the construction of the

---

[58] Mills Decl. Ex. 18 (Dep. Ex. 15 at PLF000106, 4:55 p.m.).

[59] Mills Decl. Ex. 1 (L. Greaves Tr. 141:15–19); *see also id*. Ex. 2 (M. Jarry Tr. 131:24–132:25).

[60] Mills Decl. Ex. 1 (L. Greaves Tr. 142:16–143:9); *see also id*. Ex. 18 (Dep. Ex. 15 at PLF000106, 4:55 p.m.).

[61] Mills Decl. Ex. 1 (L. Greaves Tr. 143:18–144:1).

[62] Mills Decl. Ex. 3 (TST Tr. 77:2–7); *id*. Ex. 32 (Dep. Ex. 30). The Temple testified that it paid $4,000 to the designer of the display. *Id*. Ex. 3 (TST Tr. 76:1–20); *see also id*. Exs. 30–31 (Dep. Exs. 28–29). But that testimony was based on two invoices for $2,000 that had the recipient's identity redacted. *Id*. After the deposition, the Temple produced the unredacted versions of those invoices. The unredacted versions show the recipient of these two $2,000 payments was Lucien Greaves. Mills Decl. Ex. 46.

display.[63] Finally, the Temple spent $4,000 compensating its own director, Lucien Greaves, "for his work overseeing the development of the [] monument."[64] The director submitted an invoice for his work, which included finding a designer and metalsmith to construct the monument, just three days after the Temple received its permit from the City.[65] In total, then, the Temple spent $4,600 to have the display designed and constructed by others while paying $4,000 to its own director for "overseeing" the process.

The Temple was able to completely recoup what money it did spend on the display by fundraising and showcasing the display at the Gallery. The Temple set up a third-party website to raise money for the creation, promotion, transportation, and installation of the display.[66] Through its fundraising effort, the Temple raised $12,673.[67] The Temple also collected $182,000 by charging admission for entry into

---

[63] Mills Decl. Ex. 3 (TST Tr. 63:21–66:1); *id*. Exs. 26–27 (Dep. Exs. 23–24); *see also id*. Ex. 2 (M. Jarry Tr. 96:19–97:9); *id.* Ex. 15 (Dep. Ex. 12). The fabricator had to donate 75 hours of his time. The display's own fabricator believed that the replacement value of the display was about $5,000. *See* Ex. 15 (Dep. Ex. 12); Greaves Tr. 128:7-12 ("Something more like $5k would be a reasonable amount to insurance [sic] it for I think."); TST Tr. 81:6-82:10 (discussing Dep. Ex. 12).
[64] Mills Decl. Ex. 2 (M. Jarry Tr. 80:2–19); *id*. Ex. 12 (Dep. Ex. 9); *see also id*. Ex. 2 (M. Jarry Tr. 82:19–25); *id*. Ex. 3 (TST Tr. 56:17–57:23); *id*. Ex. 46.
[65] Mills Decl. Ex. 12 (Dep. Ex. 9).
[66] Mills Decl. Ex. 3 (TST Tr. 27:17–31:10).
[67] Mills Decl. Ex. 3 (TST Tr. 26:19–22, 30:19–31:10).

the Gallery at its headquarters—$1,600 from "card-carrying members" and $180,400 from non-members.[68]

**L.    The Temple concedes that insurance premiums are not part of its claim.**

The Temple concedes that the cost to obtain the insurance policy is not part of the Temple's claims.[69] One of the Temple's directors, Jarry, could not recall whether the cost for the insurance rider "was covered under just the blanket or whether there was a supplemental charge."[70] And in any event, if there was a supplemental charge, "it would have been nominal . . . a few hundred dollars."[71] Counsel for the Temple stated during the deposition of the Temple's corporate representative, "we're not claiming insurance as damages."[72]

## Procedural Background

In April 2019, the Satanic Temple filed its complaint, alleging ten claims: (1) Violation of Free Exercise Clause; (2) Violation of Free Speech; (3) Violation of Equal Protection; (4) Violation of Contract Clause; (5) Violation of Religious Land Use and Institutionalized Persons Act of 2000; (6) Breach of Contract; (7) Promissory Estoppel; (8) Minnesota Constitution—Impairment of Contract;

---

[68] Mills Decl. Ex. 3 (TST Tr. 20:22–21:12); *id.* Ex. 1 (L. Greaves Tr. 134:4–16); *id.* Ex. 2 (M. Jarry Tr. 133:9–17).
[69] Mills Decl. Ex. 3 (TST Tr. 40:16–20).
[70] Mills Decl. Ex. 2 (M. Jarry Tr. 97:10–20).
[71] Mills Decl. Ex. 2 (M. Jarry Tr. 97:10–20).
[72] Mills Decl. Ex. 3 (TST Tr. 40:16–20).

(9) Minnesota Constitution—Free Exercise of Religion; and (10) Minnesota Constitution—Freedom of Speech. Compl. ¶¶ 46–134.

In December 2019, the Satanic Temple moved for judgment on the pleadings as to Count II of the complaint, ECF No. 22, and the City moved for judgment on the pleadings as to the entire complaint, ECF No. 27. The Court denied the Satanic Temple's motion, granted in part the City's motion, and dismissed all claims except Count VII for promissory estoppel. ECF No. 46.

After discovery, the City now moves for summary judgment on Count VII, the claim for promissory estoppel.

## Standard of Review

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Although "[t]he nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record," *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 565 (8th Cir. 2000), the nonmoving party "'must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial,'" *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). In other words, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts, and where the record as a whole could not lead a rational trier to find for the nonmoving party,

there is no genuine issue for trial." *Kiemele v. Soo Line R. Co.*, 93 F.3d 472 (8th Cir. 1996) (internal citation omitted).

## Legal Argument

Under Minnesota law, a claim for promissory estoppel has three elements: "(1) Was there a clear and definite promise? (2) Did the promisor intend to induce reliance, and did such reliance occur? (3) Must the promise be enforced to prevent injustice?" *Hous. & Redevelopment Auth. Of Chisholm v. Norman*, 696 N.W.2d 329, 336 (Minn. 2005) (citing *Olson v. Synergistic Tech. Bus. Sys., Inc*., 628 N.W.2d 142, 152 (Minn. 2001)); *City of Geneseo. V. Utilities Plus*, 533 F.3d 608, 617 (8th Cir. 2008) (citing *Olson v. Synergistic Techs. Bus. Sys., Inc*., 628 N.W.2d 142, 152 (Minn. 2001)).

The Satanic Temple's sole remaining claim for promissory estoppel is not viable because the permit to place a display in the Veterans Memorial Park—which was revocable at will and, in any event, would have expired—was not a clear and definite promise on which the Temple reasonably relied. Moreover, because the Temple did not create the display for the sole purpose of exhibiting it at the park— but instead intended to utilize and did utilize the display for the Temple's own enjoyment, publicity, and fundraising—there is no injustice for the Court to prevent.

**A. The permit was not a clear and definite promise; to the extent it was, the City properly acted on its rights as the issuer of the permit.**

The first element of promissory estoppel requires proof of a "clear and definite promise." *Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 371 (Minn. 1995). "A promise . . . is 'a manifestation of intention to act or refrain from acting in a specified way." *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 n.4 (Minn. 2014) (citing Restatement (Second) of Contracts § 2 cmt. d (1981)). The Temple's complaint alleges that "Defendants made a clear and definite promise to Plaintiff in issuing TST permit to erect a display that honors veterans in a limited public forum."[73] However, that allegation is not borne out by the facts.

Resolution 17-020, which authorized the permit, clearly stated that "[i]n the event the City desires to close the limited public forum or rescind this policy, the City, through its City Administrator, may terminate all permits by giving ten (10) days' written notice of termination."[74] In other words, the City reserved the right to terminate the policy—and all associated permits—at will.

---

[73] Compl. ¶ 107. The Complaint does not allege that the Resolution establishing the limited public forum constitutes a promise. Nor could it. "[A] law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the [legislative body] decides otherwise." *See Honeywell, Inc. v. Minn. Life & Health Ins. Guar. Assoc.*, 110 F.3d 547, 552 (8th Cir. 1997) (quoting *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 465–66 (1985)).
[74] Mills Decl. Ex. 37, ¶ 13.

Minnesota law does not recognize those words as a promise.[75] Where a party "reserves the right to terminate" at any time, its agreement "involves no promise." Restatement (Second) of Contracts § 77, cmt. a, illus. 2 (1981) ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."); *see also* Restatement (Second) of Contracts § 2, cmt. e ("Words of promise which by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise."). Moreover, "[e]ven if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in an expectation of performance." *Id*.[76]

Just as Minnesota law does not recognize the permit issued under the policy as a promise, neither did the Temple itself. Temple witnesses admitted that, under the limited public forum policy, the City could terminate a permit anytime it wanted. Not only did they testify that they understood that "the City can close the

[75] "Minnesota has adopted the statement of the doctrine of promissory estoppel found at Restatement (Second) of Contracts § 90 (1981)." *Walser v. Toyota Motor Sales, U.S.A., Inc.*, 43 F.3d 396, 400–01 (8th Cir. 1994) (citing *Christensen v. Minneapolis Mun. Employees Retirement Bd.*, 331 N.W.2d 740, 749 (Minn. 1983)).

[76] Minnesota also follows the Restatement (Second) of Contracts § 2. *Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co.*, 848 N.W.2d 539, 543 n.4 (Minn. 2014) (citing Restatement (Second) of Contracts § 2).

limited public forum or rescind the public policy with ten-days written notice,"[77] they also testified that there were no limits on the City's right to do so,[78] and that it was *reasonable* to expect that the City would in fact terminate the permits issued under the Resolution.[79]

In other words, the Temple—by its own admission—did not believe that the granting of the permit meant it was always entitled to place the display in the park. Nor could the Temple have fostered such a belief. By signing the permit application, the Temple's director agreed to comply with the City's limited public forum policy, as stated in the Resolution.[80] The Resolution specifically stated that "[i]n the event the City desires to close the limited public forum or rescind this policy, the City . . . may terminate all permits."[81] A permit issued under a resolution that depends solely on the City's "desire" cannot constitute a "clear and definite promise" that the Temple would be *guaranteed* an unfettered right.

Even if the permit could be considered a promise—it cannot—the promise would not extend as far as the Temple suggests it should. At most, by granting the

---

[77] Mills Decl. Exs. 1 (L. Greaves Tr. 40:25–42:8), 4 (Dep. Ex. 1); *see also id*. 45:19–46:8; *id*. Ex. 2 (M. Jarry Tr. 67:13–69:15).
[78] Mills Decl. Ex. 1 (L. Greaves Tr. 42:24–43:14); *see also id*. Ex. 2 (M. Jarry Tr. 28:10–29:9).
[79] Mills Decl. Ex. 1 (L. Greaves Tr. 42:3–8); *id*. Ex. 2 (M. Jarry Tr. 28:10–29:9).
[80] Mills Decl. Ex. 1 (L. Greaves Tr. 44:9–45:12, 46:1–8); *id*. Ex. 2 (M. Jarry Tr. 30:10–22); *id*. Ex. 3 (TST Tr. 18:25–19:5, 32:22–33:2); *id*. Ex. 5 (Dep. Ex. 2 at 4); *see also id*. Ex. 37, ¶ 13.
[81] Mills Decl. Ex. 37, ¶ 13.

permit, the City promised that the Temple would have *the opportunity*—not the right—to erect the display for a limited period of time, not to exceed one year. To the extent there was a promise, the City made good on it. The City provided the Temple with the opportunity to exhibit the display in the park from April to July 2017. And the Temple actively chose not to act on that opportunity during the three weeks between the completion of the display on June 23 and the Rescission Resolution on July 17. The Temple must live with the consequences of its decision.

### B. The City did not intend to induce reliance on the permit as a promise, and the Temple did not reasonably rely upon the permit.

The second element of promissory estoppel requires proof of the defendant's intent to induce reliance and proof that the plaintiff relied on defendant's inducement to the plaintiff's detriment. *Ruud*, 526 N.W.2d at 372. This element is not met on the facts of this case.

When the City adopted Resolution 17-020, the policy under which the permit was issued, the City expressly reserved its right to cancel the policy and close the limited public forum at any time.[82] Accordingly, the Temple—and anyone else seeking a permit under this policy—was on notice that the City could terminate all permits at any time. Indeed, it is settled law that "the government need not keep a limited forum open indefinitely." *Satanic Temple v. City of Belle Plaine, Minnesota,*

---

[82] Mills Decl. Ex. 37, ¶ 13.

475 F. Supp. 3d at 961 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). Given the law and the City's explicit statement in the resolution creating the limited public forum, the City did not demonstrate any intent to induce reliance on the permit as a promise. And any reliance on some unlimited right to keep a permit for the limited public forum is unreasonable as a matter of law. While the Temple would prefer to shift the focus onto the City's alleged intent to guarantee that the Temple could place the display in the park, the Minnesota Court of Appeals has rejected the search for such intent by the alleged promisor:

> "We can find no case law suggesting the fruitfulness of searching for this 'intent' on the promisor's part as opposed to exploring the promisor's reasonable expectations. Case law references to 'intent' appear to be synonymous with the requirement in the Restatement and case law that the promise be one that the promisor 'should reasonably have expected' to induce the promisee's reliance."

*Faimon v. Winona State Univ.*, 540 N.W.2d 879, 882 (Minn. Ct. App. 1995). When the inquiry is properly focused on whether the Temple could have reasonably relied on an unlimited right to place the display for a period of up to one year, the answer is clear: The Temple did not and could not have relied on the permit in that manner.

In the application for the permit, a Temple director signed an affirmation stating "that I will comply with the Limited Public Forum Policy . . . and that I will indemnify the City against any and all claims, demands or liabilities arising from the issuance of this permit, or performance of or failure to perform in accordance with

the Limited Public Forum Policy."[83] And at their depositions, the Temple directors reiterated that they understood that "the City can close the limited public forum or rescind the policy" for any reason with 10 days' notice.[84] Taken together, these facts show that the Temple knew (1) that the City's policy was revocable at will and (2) that any costs the Temple incurred would be taken at the Temple's own risk.

The Temple's actions and contemporaneous statements further support this conclusion. Even before the City had voted on the Resolution, the Temple had expressed interest "in commissioning the construction of the cube display regardless of the outcome of the vote."[85] That the Temple openly promoted the display before the City enacted the policy[86] shows that the Temple was more interested in creating a buzz than in placing the display in the park. Indeed, when the display was complete, and the permit still valid, the Temple could have—but chose not to— exhibit the display. Instead, the Temple prioritized getting the display into its Gallery for a limited run so that the Temple could earn money from admissions fees.

---

[83] Mills Decl. Ex. 5 at 4.

[84] Mills Decl. Ex. 1 (L. Greaves Tr. 41:14–23); *id.* Ex. 2 (M. Jarry Tr. 28:10–29:9); *see also id.* Ex. 1 (L. Greaves Tr. 40:4–42:2, 45:13–25).

[85] Mills Decl. Ex. 2 (M. Jarry Tr. 48:2–49:15).

[86] Hemant Mehta, *MN Town Foolishly Votes To Re-Erect Christian War Memorial, So Atheists Will Ask For One, Too*, Friendly Atheist (Feb. 7, 2017), *available at* https://friendlyatheist.patheos.com/2017/02/07/mn-town-foolishly-votes-to-re-erect-christian-war-memorial-so-atheists-will-ask-for-one-too/.

Given the language in the Resolution and the permit, the Temple could not and did not have any reasonable expectation that the permit would never be terminated. Because the Temple's director agreed to comply with the policy, which included the termination provision, the Temple's reliance on the permit could not be reasonable.

### C. The interests of justice do not require the enforcement of any promise.

The final element of promissory estoppel requires the Court to find as a matter of law that justice requires enforcing the promise. This is a question of law, not a question of fact. *See Faimon,* 540 N.W.2d at 883 (citing *Cohen v. Cowles Media Co.,* 479 N.W.2d 387, 391 (Minn. 1992) and *Spanier v. TCF Bank Sav.,* 495 N.W.2d 18, 20 (Minn. Ct. App. 1993)).

Importantly, the question "is not whether the promise should be enforced to do justice, but whether enforcement is required to prevent an injustice." *Cohen v. Cowles Media Co.,* 479 N.W.2d 387, 391 (Minn. 1992), *on reh'g,* 481 N.W.2d 840 (Minn. 1992). Justice Simonett's reasoning in *Cohen II* instructs that the test is whether equity must intervene to prevent injustice:

> It is perhaps worth noting that the test is not whether the promise should be enforced to do justice, but whether enforcement is required to prevent an injustice. As has been observed elsewhere, it is easier to recognize an unjust result than a just one, particularly in a morally ambiguous situation.

479 N.W.2d at 391. Considerations of "injustice" include "the reasonableness of a promisee's reliance and a weighing of public policies in favor of both enforcing bargains and preventing unjust enrichment." *Faimon*, 540 N.W.2d at 883; *id.* at 883 n.2 ("Satisfaction of the [injustice] requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.") (quoting Restatement (Second) of Contracts § 90.1 cmt. b (1981)). In short, the third element "involves a policy decision." *Cohen II*, 479 N.W.2d at 391.

Putting aside that there is no promise or bargain to enforce in this case, there is no injustice here that requires preventing. First, as discussed above, the Temple's reliance on the permit was not reasonable given the policy underlying the permit and the clear language of the Resolution.

*Second*, the City was not unjustly enriched. The Temple did not give the City anything of value. The display was always the Temple's property.[87] And the Temple would have remained the owner of the display, even if the Temple had chosen to

---

[87] Mills Decl. Ex. 37, ¶ 9 ("The requesting party and not the City shall own any display."); *see also id*. Ex.4 (Dep. Ex. 1 (unsigned Resolution)).

exhibit it in the park. Moreover, the City refunded Plaintiff's application fee. In sum, because the City received nothing of value from Plaintiff, the City was not unjustly enriched. This Court does not need to apply promissory estoppel in order to prevent unjust enrichment of the City. That is especially true given that the Temple was not financially harmed, but in fact managed to capitalize on the situation and profit by exhibiting the display in its Gallery.

*Third*, the Temple received—but chose not to act upon—the benefit conferred by the permit. Indeed, after conferring the permit, the City made available the park for the display from April to July, and even after the display's construction was complete, the Temple chose not to avail itself of the opportunity presented by the permit. Had the Temple chosen to place the display as soon as its construction was complete, it could have realized more benefit of the permit. But it did not. The Temple must deal with the consequences of its decisions.

*Fourth*, if the Court construes *this permit* issued under *this policy* as a promise, there will be widespread consequences for local government bodies because the Court's ruling would have the force and effect of turning every government permit into a quasi-contract, *regardless* of the terms or conditions of the specific permit. That outcome would be at odds with longstanding Minnesota law and jurisprudence. *See Meriwether Minnesota Land & Timber, LLC v. State*, 818 N.W.2d 557, 566–67 (Minn. Ct. App. 2012) ("[A]ny perceived promise in a statute is

inherently subject to the legislature's power to amend a statute, and because there is a strong presumption that statutes do not create vested and contractual rights, we conclude that the district court erred by holding that the SFIA contains an enforceable promise."). In a case involving promissory estoppel, the Minnesota Court of Appeals recognized that "[t]he Minnesota Supreme Court has indicated that estoppel may only be applied against the government when the plaintiffs, who bear 'a heavy burden of proof,' show that their interest in justice outweighs 'the public interest frustrated by the estoppel.'" *Id.* at 565 (quoting *Brown v. Minn. Dep't of Pub. Welfare*, 368 N.W.2d 906, 910 (Minn. 1985)). Equitable principles demonstrate that government entities may not be estopped on the same terms as any other party. *Meriwether*, 818 N.W.2d at 565 ("We do not envision that estoppel will be freely applied against the government.") (quoting *Mesaba Aviation Div. v. Itasca Cnty.*, 258 N.W.2d 877, 880 (Minn. 1977)); *see also Snyder v. City of Minneapolis*, 441 N.W. 2d 781, 791 (Minn. 1989). Indeed, it is "an extraordinarily rare case in which the equitable remedy of promissory estoppel" may be applied against a government entity. *Meriwether*, 818 N.W.2d at 565. This case is not one of them.

Based on this authority, the Court should *presume* that the Temple understood the extent of the authority granted by the permit and the limitations inherent within it because of the City's limited public forum policy. In any event, the Temple *did know* the extent of the authority granted by the permit. By signing

the permit application, a Temple director agreed to comply with the City's limited public forum policy,[88] which clearly stated that all permits issued under the Resolution would be revocable at will. Any action by the Court requiring the City to compensate the Temple or requiring the City to allow the Temple to place the display in the park would have the effect of rewriting Resolution 17-020 and altogether ignoring the Rescission Resolution. No equitable principles compel such a result.

Furthermore, the requirements of Minnesota Statutes Section 412.201 preclude a determination under the equitable principles of estoppel that it is reasonable to rely on representations. *See Plymouth Foam Prods.*, 944 F. Supp. at 785, *aff'd*, 120 F.3d 153 (8th Cir. 1997). "No representation, statement, promises, or acts of ratification by officers of a municipal corporation or a county can operate to estop it to assert the invalidity of a contract where such officers were without power to enter into such a contract on behalf of the corporation." *Id.* at 157. The Eighth Circuit held that any reliance upon such alleged promises was unreasonable as a matter of law. *See id.* ("All persons contracting with a municipal corporation are conclusively presumed to know the extent of the authority possessed by the officers with whom they are dealing." (*quoting Jewell Belting Co. v. Village of Bertha*, 97 N.W.

---

[88] Mills Decl. Ex. 5 at 4; *id*. Ex. 1 (L. Greaves Tr. 44:9–45:12, 46:1–8); *id*. Ex. 2 (M. Jarry Tr. 30:10–22); *id*. Ex. 3 (TST Tr. 18:18–19:5, 32:22–33:9).

424, 425 (Minn. 1903)). Other courts applying Minnesota law have held the same. *See City of Geneseo, Illinois v. Utilities Plus*, No. CIV 05-2689 ADM/JJG, 2007 WL 1027294, at \*11 (D. Minn. Apr. 3, 2007) ("[A]bsent an official act by UP's Board indicating that Kom had authority to offer A4, Geneseo's reliance on Kom's purported offer was unreasonable as a matter of law."), *aff'd sub nom. City of Geneseo. v. Utilities Plus*, 533 F.3d 608 (8th Cir. 2008).

### D. The relief available under promissory estoppel does not include placing the display in the park.

To the extent the Temple seeks to now exhibit the display in the park, such relief should be denied. By its own terms, the permit allowed the Temple to place the display in the Park for a period of up to one year. The permit included express statements that "this permit is good for one year from the date of this letter" and that the Temple would need to "reapply to place another display once the display under this permit is removed."[89] Even if the City had not enacted the Rescission Resolution at the end of the year contemplated in the permit, by March 29, 2018, the Temple would be *in the same position it is in today*: it owns a display that may not be placed in that park.[90] The Temple recognized that once the display could not

---

[89] Mills Decl. Ex. 5 (Dep. Ex. 2).
[90] See Mills Decl. Ex. 2 (M. Jarry Tr. 74:14–75:22 (discussing Dep. Ex. 7 (Mills Decl. Ex. 10) at PLF000019, 3:57 a.m.).

be in the park, the Temple could bring the display to Salem or sell it.[91] The Temple cannot use the equitable doctrine of promissory estoppel to seek an outcome which would not be available to it under any other circumstances. The Temple may not rely on equitable principles to rewrite Resolution 17-020 and overrule the Rescission Resolution. Belle Plaine has the legal right to control its park.

Minnesota law "limit[s] relief available under Restatement of Contracts § 90 to the extent necessary to prevent injustice." *Olson v. Synergistic Techs. Bus. Sys., Inc.*, 628 N.W.2d 142, 151 (Minn. 2001) (citing *Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.*, 291 Minn. 113, 120, 190 N.W.2d 71, 75 (1971)). For this reason, "relief may be limited to damages measured by the promisee's reliance." *Walser v. Toyota Motor Sales, U.S.A., Inc.*, 43 F.3d 396, 402 (8th Cir. 1994) (citing *Grouse v. Group Health Plan*, 306 N.W.2d 114, 116 (Minn. 1981)). The Temple does not have damages here because: (1) the Temple's fundraising of $12,673 for the display exceeded its expenditures to make the display;[92] (2) the Temple collected $182,000 in admissions fees by exhibiting the display in the Gallery;[93] (3) the City refunded the Temple's $100 application fee for the permit;[94] and (4) the Temple does not

---

[91] Mills Decl. Ex. 2 (M. Jarry Tr. 74:14–75:22 (discussing Dep. Ex. 7 (Mills Decl. Ex. 10) at PLF000019, 3:57 a.m.); *id*. Ex. 3 (TST Tr. 92:21–93:22); *id*. Exs. 2 (M. Jarry Tr. 93:9–94:5), 14 (Dep. Ex. 11).

[92] *See supra*, Statement of Facts, Section K.

[93] Mills Decl. Ex. 3 (TST Tr. 20:22–21:12); *see also id*. Ex. 1 (L. Greaves Tr. 134:4–16).

[94] Mills Decl. Ex. 2 (M. Jarry Tr. 43:24–44:9); *id*. Exs. 8 (Dep. Ex. 5), 43.

claim insurance as damages.[95] No relief is necessary to prevent injustice. This Court should deny all relief.[96]

## Conclusion

The City respectfully requests that the Court grant summary judgment in the City's favor and dismiss Plaintiff's claims with prejudice.

Dated:  February 5, 2021          **GREENE ESPEL PLLP**


                                   s/*Monte A. Mills*
                                  Monte A. Mills, Reg. No. 030458X
                                  Davida S. McGhee, Reg. No. 0400175
                                  222 S. Ninth Street, Suite 220
                                  Minneapolis MN 55402
                                  mmills@greeneespel.com
                                  dwilliams@greeneespel.com
                                  (612) 373-0830

                                  *Attorneys for Defendants*

---

[95] Mills Decl. Ex. 3 (TST Tr. 40:16–20 (counsel for the Temple stated "we're not claiming insurance as damages. So let's just keep it rolling.")).

[96] Even if the Temple could establish that it suffered monetary damages, such relief should be denied because Minnesota principles of equity dictate that estoppel theories may not be used to recover money damages against a city that grants and later revokes a permit. *Snyder v. City of Minneapolis*, 441 N.W.2d 781, 791 (Minn. 1989).